**2011 BNH 007**

_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:

Financial Resources Mortgage, Inc. and                    Bk. No. 09-14565-JMD
C L & M, Inc.,                                            Bk. No. 09-14566-JMD
and other jointly administered cases,                    Chapter 7
          Debtors

Steven M. Notinger, Chapter 7 Trustee for
Financial Resources Mortgage, Inc. and
C L & M, Inc.,
          Plaintiff

v.                                                       Adv. No. 10-1075-JMD

Philip Migliaccio and
Melanie Migliaccio,
          Defendants

*James W. Donchess, Esq.*
*Donchess & Notinger, PC*
*Nashua, New Hampshire*
*Attorney for Plaintiff*

*Bertrand A. Zalinsky, Esq.*
*Cronin & Bisson, P.C.*
*Manchester, New Hampshire*
*Attorney for Defendants*

## MEMORANDUM OPINION

## I.  INTRODUCTION

      Steven M. Notinger, the chapter 7 trustee (the "Trustee") for the bankruptcy estates of

Financial Resources Mortgage, Inc. ("FRM") and C L and M, Inc. ("CLM") (collectively, the

"Debtors"), brought an adversary proceeding against Phillip and Melanie Migliaccio (the

"Migliaccios" or the "Defendants") requesting that the Court declare certain promissory notes, mortgages, and other property standing in the name of the Migliaccios as property of FRM's and/or CLM's bankruptcy estates and to avoid various transfers as fraudulent and/or preferential. Second Amended Complaint (Doc. No. 48) (the "Complaint").  The Migliaccios have filed a motion seeking to dismiss the Complaint on the grounds the Trustee has failed to state a claim upon which relief can be granted (Doc. No. 56) (the "Motion").  For the reasons stated in this opinion, the Motion shall be granted in part and denied in part.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).


## II.  MOTION TO DISMISS STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings in bankruptcy cases by Federal Rule of Bankruptcy Procedure 7012(b), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In ruling on a Rule 12(b)(6) motion to dismiss, courts "must accept as true the well-pleaded factual allegations of the complaint" and draw all reasonable inferences in the plaintiff's favor.  LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998). While a complaint does not require detailed factual allegations to survive a motion to dismiss, it must contain more than labels and legal conclusions.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "[Although] legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).  A

pleading that offers only a formulaic recitation of the elements of a cause of action must be dismissed.  Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 129 S.Ct. at 1949.

Thus, a complaint that just pleads facts consistent with a defendant's liability does not carry the day because it "stops short of the line between possibility and plausibility."  Id. (quoting Twombly, 550 U.S. at 557).  A complaint must allege facts which will establish a plausible claim for relief.  A complaint establishes facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the . . . court to draw on its judicial experience and common sense."  Id. at 1950.  And, although trial courts must take all factual allegations in the complaint as true, they are not bound to accept as true legal conclusions couched as factual allegations.  Id. at 1949-50.

When considering a motion to dismiss, courts usually only look to the complaint itself. Under narrow exceptions, however, courts may consider "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice."  Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).  Courts may also consider documents the authenticity of which is not disputed by the parties and official public records.  Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 47 n.1 (1st Cir. 2009).

## III.  BACKGROUND

The Court draws the following factual background from the Complaint, which statements the Court accepts as true for purposes of the Motion.  Between 2005 and 2009, FRM and CLM were in the business of raising funds and organizing and funding real estate transactions as mortgage brokers.  The Migliaccios were so-called investors or lenders[1] in FRM and CLM. They transferred funds to CLM on five occasions in 2008 to fund various loans to third-party borrowers (collectively, the "Migliaccio Loans").  On or about March 7, 2008, the Migliaccios transferred $126,500.00 to CLM to be used to fund a loan to Eric Hopkins (the "Hopkins Loan"), which loan closed on or about March 13, 2008.  On or about April 21, 2008, the Migliaccios transferred $82,000.00 to CLM to be used to fund a loan to George Walker (the "Walker Loan"), which loan closed on or about May 21, 2008.  On or about May 27, 2008, the Migliaccios transferred $59,655.00 to CLM to be used to fund a loan to Fay Inovlotska (the "Inovlotska Loan"), which loan closed on or about June 13, 2008.  On or about July 10, 2008, the Migliaccios transferred $35,940.00 to CLM to be used to fund a loan to Jakobola (the "Jakobola Loan"), which loan did not close and which funds were returned to the Migliaccios on August 20, 2008.  On or about July 25, 2008, the Migliaccios transferred $108,000.00 to CLM to be used to fund a loan to Christopher and Janel Sewell (the "Sewell Loan"), which loan closed on or about August 14, 2008.  The Sewells paid the Migliaccios $111,783.00 on December 4, 2009, in full satisfaction of their obligation on the Sewell Loan.

---

[1]  The Trustee refers to the Migliaccios, and other like them, as "investors" in FRM and CLM. The Migliaccios prefer to be called "lenders" as they state they delivered monies to CLM in order to fund loans brokered by FRM and/or serviced by CLM.  They note the Trustee has not alleged that the Migliaccios placed their funds with FRM or CLM with any intent to contribute to a common business enterprise.

4

When the Migliaccios transferred money to CLM, it was placed into one of two separate CLM accounts, either Citizens Bank Account No. 330403-744-8 ("7448") (for the Walker, Inovlotska, Jakobola, and Sewell Loans) or Citizens Bank Account No. 330403-738-3 ("7383") (for the Hopkins Loan). The Trustee describes both of these accounts as "commingled accounts" as the accounts held funds from various CLM investors not just the Migliaccios, i.e, the Migliaccios' funds were commingled with the funds of other investors. When the various Migliaccio Loans closed, the funds that were paid to the borrowers did not come from the account into which the Migliaccios' funds had been initially deposited but rather from the other commingled account. For that reason, the Trustee contends the Migliaccios cannot trace their funds through the commingled accounts.

CLM promised to pay and did pay the Migliaccios interest from the date of their initial investments through the date a particular loan closed and was funded. Prior to the loans' closings, the Migliaccios received $537.63 of interest on the Jakobola Loan and $762.39 of interest on the Sewell Loan. The Complaint is silent as to whether the Migliaccios received interest on the other Migliaccio Loans prior to their closings.

In connection with various loans, CLM and/or FRM claimed to be reserving one to two years of "prepaid interest" out of the loan proceeds ("False Prepaid Interest"), which interest CLM was to pay to the investors/lenders for the first few years after the loans closed. CLM "generally" withheld False Prepaid Interest from each borrower; however, such money was commingled with other investor funds. It was not earmarked or segregated to pay interest to any investor or lender for the loan transaction from which it was withheld. Rather, interest paid to investors or lenders for such transactions was paid from funds forwarded by later investors. In addition to False Prepaid Interest, CLM and/or FRM also paid interest to lenders, like the

Migliaccios, on loans that required the borrowers themselves to pay the interest ("False Interest").  Again, this interest was paid from funds forwarded by later investors.

Following the funding of the Migliaccio Loans, the Migliaccios received interest payments on the loans.  CLM paid the Migliaccios $15,560.20 in interest with respect to the Sewell Loan.  The Complaint is silent as the amount of interest that was paid to the Migliaccios on the other Migliaccio Loans after their funding.

On November 20, 2009, more than fifteen months after the last of the Migliaccio Loans closed, involuntary bankruptcy petitions were filed against FRM and CLM by the Office of the Attorney General of the State of New Hampshire and others.  The bankruptcy filings were in response to various lawsuits, attachments, and trustee removal actions being filed against FRM, CLM, and related parties, in which allegations of fraud were brought against FRM, CLM, and their principal, Scott Farah ("Farah").  From 2005 through 2009, Farah improperly took funds from CLM totaling $20,348,321.43.  On June 1, 2005, Farah executed a note in favor of CLM in the principal amount of $10,000,000.00, and on November 5, 2009, he revised the note to reflect a principal amount due of $20,348,321.43 (the "Stolen Funds Promissory Note").  The Trustee contends that Farah began stealing money from FRM and CLM no later than June 2005, and that by that date FRM and CLM began a fraudulent scheme to defraud investors and the public.  As part of the scheme, FRM and CLM raised money from investors, commingled that money, and then used that money to fund various loans and to pay False Prepaid Interest and False Interest. As of June 2005, FRM and CLM did not have sufficient funds to cover the obligations each was incurring or to return the funds collected.  FRM and CLM used funds collected from later investors to fund various loans.  Numerous investors in FRM and/or CLM invested funds

through FRM and CLM but received no real estate investment, mortgage, or other purported assets of value as a result of their investments.

Subsequent to the bankruptcy filings, the Trustee was appointed the chapter 7 trustee for the FRM and CLM bankruptcy estates. He brought suit against the Migliaccios seeking (1) declarations that certain promissory notes, mortgages, and other property standing in the name of the Migliaccios are property of the bankruptcy estates and therefore must be turned over to the Trustee, and (2) avoidance of various transfers as fraudulent and/or preferential. He specifically seeks a declaration that the Migliaccios' interests in the Hopkins Loan, the Walker Loan, the Inovlotska Loan, the Jakobola Loan, and the Sewell Loan are property of the estates under 11 U.S.C. § 541. Count I of the Complaint. He seeks a declaration that the $37,477.62[2] CLM paid and/or returned to the Migliaccios on account of the Jakobola loan and the $127,234.20 in collections the Migliaccios made on the Sewell Loan are property of the estates and must be turned over to the estates presumably pursuant to 11 U.S.C. § 542. Count I of the Complaint. The Trustee seeks the avoidance of various transfers by FRM and/or CLM as fraudulent under 11 U.S.C. § 548. Count II of the Complaint. He seeks the avoidance of those same transfers as fraudulent under 11 U.S.C. § 544(b) and NH RSA 545-A:4(I)(A). Count III of the Complaint. The Trustee seeks the avoidance of various transfers by FRM and/or CLM as preferential under 11 U.S.C. § 547(b). Count IV of the Complaint. The Trustee further seeks the return of all

---

[2]   The Complaint contains a discrepancy regarding the amount paid and/or returned to the Migliaccios on account of the Jakobola Loan. Paragraphs 42 and 43 of the Complaint indicate that the Migliaccios invested $35,940.00 with CLM and obtained $537.63 in interest. Together these amounts total $36,477.63, which is only one penny different than the amount the Trustee alleges in paragraph 45 was paid to the Migliaccios. However, in paragraph 48, the Trustee indicates $37,477.62 was paid to the Migliaccios and this included $1,537.62 in "profits." The Trustee repeats the $37,477.62 figure in paragraphs 92 and 100 and introduces a new figure of $37,477.68 in paragraphs 95 and 101.

property of FRM and/or CLM, discovered or undiscovered, in the Defendants' possession
pursuant to 11 U.S.C. § 542. Count V of the Complaint.

## IV. DISCUSSION

The Migliaccios seek to dismiss all counts of the Complaint. Accordingly, the Court
shall address the sufficiency of the Complaint with respect to each count.

### A. Count I

In Count I of the Complaint, the Trustee seeks (1) a declaration that "funds and assets of
CLM and FRM are and were held subject [to a] constructive trust in favor of all of the investors
of CLM and FRM," (2) a declaration that "both the legal and equitable interest of the Defendants
in the Sewell Loan, in the Hopkins Loan, in the Jakob[o]la Loan, in the Hopkins Loan and in the
Inovlotska Loan and the collections the Migliaccios made on the Sewell loan and the payments
CLM made to the Defendants on the Jakobola Loan, is property of the estate," and (3) an
"[o]rder, pursuant to 11 U.S.C. §541, that the Defendants return to the estates of CLM and FRM
all interests in the Loans, including notes and mortgages, and return to the estate all payments of
False Prepaid Interest and/or False Interest paid by CLM and/or FRM and pay to the estates the
$127,243.20 collected on the Sewell loan and the $37,477.62 CLM paid to the Defendants on the
Jakobola Loan." The Migliaccios contend that Count I should be dismissed because the Debtors
have no legal or equitable interest in the Migliaccio Loans and because the Trustee does not have
standing to raise the equitable claims of non-debtors upon which his constructive trust theory
relies. The Trustee contends that Count I states a claim because commingled funds were used to
fund the Migliaccio Loans thus making the Migliaccio Loans part of the Debtors' estates.

Section 541(a) of the Bankruptcy Code provides that an estate is created upon the filing of a bankruptcy case, and the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever such property is located and by whomever held.  11 U.S.C. § 541(a)(1).  The Trustee seeks an order from the Court that would declare the following as property of the estates of FRM and/or CLM and require their turnover to the Trustee:

1.    The interest paid to the Migliaccios in 2008 and 2009 on the Migliaccio Loans;

2.    The money returned to the Migliaccios on the Jakobola Loan;

3.    The money collected by the Migliaccios on the Sewell Loan; and

4.    The notes and mortgages held by the Migliaccios with respect to the Hopkins Loan, the Walker Loan, and the Inovlotska Loan.

The Complaint does not contain any allegation that either of the Debtors held <u>legal title</u>, as of the commencement of the case, to the Migliaccio Loans or the monies paid to the Migliaccios on account of any of the Migliaccio Loans, e.g., interest payments or funds collected on the Sewell Loan.  The Complaint does not allege that any of the promissory notes, mortgages, or other loan documents that were created, executed, and delivered in connection with the Migliaccio Loans were made out in the names of the Debtors, or that such documents were ever titled to persons other than the Migliaccios.  In fact, the Trustee concedes that the Migliaccios hold legal title to the property at issue.  Complaint ¶ 88 ("The assets to which the Defendants currently hold legal title . . . should be found to be part of the estates of CLM and FRM . . .").

The Complaint also does not contain any allegation that FRM and/or CLM held <u>equitable title</u>, as of the commencement of the case, to the Migliaccio Loans or the monies paid to the

Migliaccios on account of any of the Migliaccio Loans.  Rather, the Complaint describes

equitable interests in the various loans as follows:

> [I]nvestors have competing equitable claims to the same underlying mortgages.
> . . .
>
> The commingling of funds by CLM and/or FRM in violation of their fiduciary
> duty to investors, together with CLM and FRM's fraud and misrepresentation,
> created an equitable claim of all investors in the funds of CLM and FRM.  CLM
> and FRM were holding funds in trust for the benefit of all investors and the
> FRM/CLM investors have a constructive trust claim in all the assets of CLM and
> FRM.
> . . .
>
> When CLM funded each of the Loans, CLM's commingled funds were already
> encumbered with the equitable claims of all investors in CLM and/or FRM.
> Those assets were being held in a constructive trust for all of the CLM and FRM
> investors.
> . . .
>
> The investors defrauded by CLM and/or FRM hold an equitable interest and
> constructive trust in the assets which were transferred by CLM to the Defendants
> in the form of False Prepaid Interest and/or False Interest.

Complaint ¶¶ 79, 81, 83, and 86 (emphasis added).  In other words, the Complaint alleges that

the investors, whose funds were commingled prior to the funding of any particular loan, are the

ones entitled to claim they are the beneficiaries of a constructive trust, not FRM and/or CLM.

The Complaint does not allege that the Debtors were, at the time of the bankruptcy filing,

entitled to be the beneficiaries of a constructive trust.  Rather, the Trustee admits that the

Debtors held the investors' funds in trust.  Id. ¶ 80 ("CLM and FRM had a fiduciary duty to its

investors and held funds in trust for their investors.") (emphasis added).  The Bankruptcy Code

excludes from the estate any "property which the debtor holds, as of the commencement of the

case, only legal title and not an equitable interest."  11 U.S.C. § 541(d); see Begier v. IRS, 496

U.S. 53, 59 (1990) (stating that when a debtor does not own an equitable interest in the property

he holds in statutory trust for another, that interest is not property of the estate for purposes of the Bankruptcy Code).

In support of his position, the Trustee cites the case of Corporate Fin., Inc. v. Fidelity Nat'l Title Ins. Co. of New York (In re Corporate Fin., Inc.), 221 B.R. 671 (Bankr. E.D.N.Y. 1998).  In that case, the chapter 11 debtor brought an adversary proceeding seeking a declaration that certain notes and related mortgages were property of its bankruptcy estate.  At issue was whether the defendants had purchased true mortgage participations and, if so, whether they were to be excluded from the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(d).  The court held that the joint venture agreements between the debtor and investors, who advanced money to enable the debtor to make the loans, were more consistent with true mortgage participations rather than separate loans of the debtor.  Id. at 681.  The court concluded, however, that equity required that the mortgages be included in "property of the estate" based on the evidence of the debtor's pervasive fraud and improper business practices in operating its business.  Id. at 681-82.

While similarities exist between the facts in Corporate Financing and the facts in this case, the Court notes one key distinction.  In Corporate Financing, the notes and mortgages were held in the name of the debtor, not in the name of the investors.  See id. at 675.  Although not clearly alleged in the Complaint, it appears undisputed that the Migliaccio Loans are in the names of the Migliaccios (i.e., the Migliaccios are listed as the payees on the notes and the mortgagees on the mortgages) and not in the name of FRM or CLM.  Given that the notes and mortgages in Corporate Financing were in the debtor's name, it is not surprising then, under the facts of that case, that the court would find that the notes and mortgages were property of the estate.

The Trustee also cites Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.) 67 B.R. 198 (Bankr. D. Nev. 1986), in support of his position.  In that case the court was required to determine the interests and rights of several thousand investors in promissory notes, secured by deeds of trust on real property, that were issued by the debtor, Lemons & Associates, which was operating as a mortgage company.  Like Corporate Financing, Lemons & Associates was the payee of the notes and the beneficiary of the deeds of trust, not the investors.  Id. at 203. The court found that the transactions should be characterized as sales of interests in the notes rather than loans by investors secured by interests in the notes.  Id. at 209.  The court ultimately concluded that the legal and equitable ownership of the notes and related deeds of trust would remain with the trustee.  Id. at 216.  The court noted, however, that with respect to one deed of trust, which had been foreclosed, title had thereby been placed in the investors' names.  Id.  The court held that because those investors had legal title, not merely an equitable claim, the trustee was obligated to release the property to them unless the trustee could successfully void their title under some other theory.  Id.  In other words, the investors who held legal title prevailed against the trustee despite ample evidence of pervasive fraud and commingling.  Thus, the cases cited by the Trustee do no persuade the Court with respect to Count I.

The Court notes further that the Trustee's theory in Count I of the Complaint is inconsistent with his theories in Counts II through IV.  In Counts II through IV, the Trustee contends that property was transferred from FRM and/CLM to the Migliaccios and third-party borrowers and that those transfers should be avoided as fraudulent and preferential.  Thus, the Complaint alleges that, by the petition date, all of the property at issue already had been transferred by FRM and CLM.  Having alleged the property was transferred, the Trustee cannot also contend that it is simultaneously still a part of the Debtors' estates.  Unless and until the

transfers are avoided through a successful avoidance action, the property transferred cannot be considered part of the Debtors' bankruptcy estates.  See Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC), 445 B.R. 206, 236-238 (Bankr. S.D.N.Y. 2011) (holding that the trustee was not entitled to an accounting and the immediate turnover of funds under 11 U.S.C. § 542 unless and until the prepetition transfers had been recovered through an avoidance action).

Accordingly, because the Complaint lacks any allegations that, as of the commencement of the case, the Debtors had any legal or equitable interests in the property the Trustee seeks to include as part of the Debtors' bankruptcy estates, i.e., (1) the interest paid to the Migliaccios in 2008 and 2009 on the Migliaccio Loans, (2) the money returned to the Migliaccios on the Jakobola Loan, (3) the money collected by the Migliaccios on the Sewell Loan; and (4) the notes and mortgages held by the Migliaccios with respect to the Hopkins Loan, the Walker Loan, and the Inovlotska Loan, and because, in fact, the Complaint alleges that the property at issue had been transferred by FRM and/or CLM prepetition, the Court finds that Count I of the Complaint fails to state a claim under 11 U.S.C. §§ 541(a) and 542 upon which relief can be granted.

**B.  Counts II and III**

In Counts II and III, the Trustee seeks to avoid transfers as fraudulent under both federal law and state law.  In Count II, the Trustee seeks to avoid various transfers pursuant to 11 U.S.C. § 548(a)(1), which provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

13

(B)(i) received less than a reasonably equivalent value in exchange for such
transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation
was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business
or a transaction, for which any property remaining with the debtor was an
unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would
be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such
obligation to or for the benefit of an insider, under an employment contract and
not in the ordinary course of business.

11 U.S.C. § 548(a)(1).  In Count III, the Trustee asserts a claim under 11 U.S.C. § 544(b), the

Bankruptcy Code provision permitting the avoidance of transfers that are voidable under

applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502

or that is not allowable only under 11 U.S.C. § 502(e).  See Official Comm. of Unsecured

Creditors v. Foss (In re Felt Mfg. Co., Inc.), 371 B.R. 589, 634 (Bankr. D.N.H. 2007).  The

''applicable law'' referred to in 11 U.S.C. § 544(b) includes New Hampshire's version of the

Uniform Fraudulent Transfer Act (the ''UFTA'') found in NH RSA 545-A.  Id.  The UFTA is

similar to § 548 of the Bankruptcy Code.  Id.  The Trustee seeks to find certain transfers

fraudulent under RSA 545-A:4(I)(a) which provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
whether the creditor's claim arose before or after the transfer was made or the
obligation was incurred, if the debtor made the transfer or incurred the obligation:
(a) With actual intent to hinder, delay, or defraud any creditor of the debtor . . .

NH RSA 545-A:4(I)(a).

The Migliaccios contend that Count II, asserting federal claims for both actual and

constructive fraud, and Count III, asserting a state claim for actual fraud, must be dismissed

because the Trustee has failed to state a claim upon which relief can be granted.  The Migliaccios

14

have raised many issues concerning the fraudulent transfer counts, which the Court will address in turn.

### 1. Property of the Debtor

The Migliaccios argue that the Trustee has failed to plead facts from which the Court may reasonably conclude that the funds transferred constitute "an interest in property of the debtor," which is a required element in proving any fraudulent transfer under § 548. The Complaint supports the contention that, as of the date of the transfers, CLM held legal title to the funds as they were being held in CLM's bank accounts. E.g., Complaint ¶¶ 32, 35, 38, 54, 61, and 67. At issue is whether the Debtors also held an equitable interest in the funds. See Askenaizer v. May (In re Jewett), 2007 BNH 018, 7. Determining a debtor's property rights as of the date of a transfer is a matter of state law. Butner v. United States, 440 U.S. 48, 54 (1979). Thus, New Hampshire law determines whether the Debtors had an equitable interest in the funds such that monies transferred were transfers of "an interest in property of the debtor."

According to the Migliaccios, the funds in CLM's accounts, which were ultimately transferred to third party borrowers or paid back to the Migliaccios in the form of False Prepaid Interest, False Interest, or a return of monies on account of the Jakobola Loan that never closed, consisted of monies from other investors and therefore was not property of the Debtors. Rather, they state that the Trustee has alleged in the Complaint, the money was being held in a constructive trust for the benefit of investors.[3] Complaint ¶¶ 80, 81, 83, and 86. The Migliaccios

---

[3] "A constructive trust may be imposed when clear and convincing evidence shows that a confidential relationship existed between two people, that one of them transferred property to the other, and that the person receiving the property would be unjustly enriched by retaining the property, regardless of whether the person obtained the property honestly." In re Cass, 143 N.H. 57, 60 (1998). "[U]njust enrichment is the core consideration in the constructive trust analysis." Marcucci v. Hardy, 65 F.3d 986, 990 n.6 (1st Cir. 1995).

contend that because the prepetition transfers consisted of trust fund property, the Debtors never had any interest in the funds, and therefore it was never the Debtors' "property" within the meaning of the Bankruptcy Code, and thus the Trustee cannot avoid the transfers as fraudulent pursuant to § 548 or RSA 545-A.  See Hanley v. Notinger (In re Charlie's Quality Carpentry, LLC), 2003 BNH 025, 11; see also Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 851 (6th Cir. 2002) (holding that monies being held by a real estate closing attorney, in an escrow account in an express trust for his clients, were not part of his bankruptcy estate and therefore were not subject to the bankruptcy trustee's avoidance power under § 548).

The Trustee does not dispute that the money was being held in trust.  Instead, he argues that even if the funds were being held in a constructive trust for the benefit of investors, the investors (and specifically the Migliaccios) are unable to trace the money being held in that constructive trust, and therefore the trust has been lost.  In support of his position, the Trustee relies on the principles outlined in Connecticut Gen. Life Ins. v. Universal Ins. Co., 838 F.2d 612, 618-20 (1st Cir. 1988).  According to Connecticut General, in order to establish rights as a trust beneficiary, the claimant must demonstrate: (1) the existence and legal source of a trust relationship; and (2) the identity of the trust fund or property and, where the trust fund has been commingled with the general property of the debtor, sufficiently trace the property or funds, i.e., the res.  Id. at 618.  "The normal rule for construing trust proceeds commingled in a bank account is known as the 'lowest intermediate balance test.'"  Id. at 619.  Under that test, if the amount on deposit has at all times since the commingling equaled or exceed the amount of the trust fund, the claimant is entitled to the full amount of the trust fund.  Id.  If the amount on deposit has been withdrawn, the claimant is entitled to nothing as the trust has been lost.  Id.  If the amount on deposit has been reduced below the amount of the trust fund but has not been

depleted, the claimant is entitled to the lowest intermediate balance in the account.  Id.  "The lowest intermediate balance test is grounded in the fiction that if a trustee makes a withdrawal from a mixed account for personal purposes, such withdrawal will be charged to the non-trust funds first, thus maintaining as much of the trust funds as possible."  Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron), 155 F.3d 718, 722 (4th Cir. 1998).

The Complaint contains sufficient allegations that the property in the bank accounts was commingled.  Complaint ¶ 16 ("CLM and/or FRM funded each Fraudulent Loans out of commingled funds collected from investors."), ¶ 33 ("CLM's Commingled Account 7448 was a commingled account holding the funds of CLM investors."), ¶ 37 ("[O]ther investors' funds were commingled in the same Commingled Accounts with the funds of the Migliaccios."), and ¶ 73 ("CLM commingled the funds invested by the Migliaccios with funds invested by other investors.").[4]  In addition, the Court finds that the Complaint contains sufficient allegations on the issue of tracing to survive the Migliaccios' motion to dismiss on this element of the Trustee's claims.  The Trustee contends that the Migliaccios cannot trace their funds because the Migliaccios' monies flowed into one account (7448 for the Sewell, Jakobola, Walker, and Inovlotska Loans and 7383 for the Hopkins Loans) but were paid out to the third party borrowers, or returned or paid to the Migliaccios, from a different account (7383 for the Sewell, Walker, and Inovlotska Loans and 7448 for the Hopkins Loan).  Complaint ¶¶ 32, 35, 44, 51, 54,

---

[4]  The Court notes that the Complaint does not explicitly state, however, that the monies placed in the commingled accounts were commingled with either of the Debtors' own funds as Connecticut General seems to require.  If the Trustee is unable to present proof on that issue at trial, the Trustee may have difficulty establishing that element of his claim under § 548 and RSA 545-A.  At this time, the Court makes no ruling on the necessity of establishing the commingling of investor funds with funds of the Debtors.  See Cannon, 277 F.3d at 851 ("[T]he commingling of funds held in express trust in the escrow accounts does not alter their character, and those funds remain outside the estate under section 548."); Daly v. Kennedy (In re Kennedy), 279 B.R. 455, 461 n.8 (Bankr. D. Conn. 2002) ("Commingling, standing alone, does not undermine a person's beneficial interest in trust property.")

59, 61, 66, and 67.  The Trustee has alleged that "CLM used the commingled funds of investors other than the Migliaccios to fund the [Migliaccio] Loans."  Id. ¶ 74.  The Trustee contends that the Migliaccios also cannot trace their funds because there are many competing claims to the same money in the commingled accounts, including the claims of earlier investors whose funds had been commingled, and the account did not have nearly enough money to satisfy all of these claims.  Id. ¶¶ 37, 47, 55, 62, and 69.  The Complaint alleges "[i]t is impossible to trace the funds because every investor has a tracing claim in every other investor's money."  Id. ¶ 83.

Viewing the allegations in the Complaint in the light most favorable to the Trustee, the Trustee has alleged that, at the time all of the transfers were made, the monies were held in CLM's bank account thus placing legal title to the funds in CLM and that the funds collected by CLM from the various investors and lenders were commingled and cannot be traced under the principles outlined in Connecticut General.  Assuming the inability to trace the funds, the constructive trust would be lost, with the result that CLM would have had an equitable interest in the funds at the time of their transfer.  Under these facts, as alleged, it is plausible that the Court may find that the property transferred to the Migliaccios was of an interest of the Debtors in property.

### 2.  Actual Intent to Hinder, Delay or Defraud

The Migliaccios contend that the Complaint fails to plead facts from which the Court may reasonably conclude that the Debtors made the alleged transfers with "actual intent to hinder, delay, or defraud" creditors, a requirement under both § 548(a)(1)(A) and RSA 545-A:4(I)(a).  They undertake an analysis of the "badges of fraud"[5] alleged by the Trustee and

---

[5]  The courts have developed certain "badges of fraud" to establish actual intent to hinder, delay, or defraud creditor under § 548 since actual intent is frequently difficult to prove.  See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991); see also RSA 545-

conclude that the Trustee's failure to allege a larger number of badges warrants a finding that the Complaint does not plead fraud with the specificity required and thus should result in dismissal of Counts II and III.  The Migliaccios contend that the Trustee has failed to plead the requisite actual intent or, alternatively, badges of fraud on the part of CLM to hinder, delay, or defraud creditors through the specific transfers outlined in the Complaint.

In response, the Trustee argues that the indicia of fraud outlined in federal case law and in the state statute are not exhaustive.  The Court agrees.  See Max Sugarman, 926 F.3d at 1254 (listing "the more common circumstantial indicia of fraudulent intent"); RSA 545-A:4(II) (stating "consideration may be given, among other factors, to the following . . . ") (emphasis added).   The Trustee alleges in the Complaint that "CLM made each of the transfers with the actual intent to hinder, delay or defraud creditors of CLM and/or FRM . . ."  Complaint ¶ 91. The Complaint then describes that CLM was "engaged in a scheme to defraud investors and creditors" and that Farah testified that "he was conducting a fraud" and "as part of his scheme he used trusts to avoid the securities laws of the State of New Hampshire" and that he signed the Stolen Funds Promissory Note so that the liability would not go on the FRM balance sheet and so that he would not get "caught."   Complaint ¶ 91; see also Complaint ¶ 6 ("The ultimate purpose of their operation was, however, a fraudulent scheme organized to defraud investors and the public."), ¶ 8 ("Scott Farah, through both FRM and CLM, raised at least $82 million from investors based upon false representations that invested funds would be invested in real estate loans that were identified by CLM and FRM."), ¶ 10 ("[I]t was in June, 2005 that the Stolen Funds Promissory Note indicated that Farah began stealing money from the FRM and/or CLM."), and ¶ 80 ("CLM and FRM obtained investments and funds from investors through

A:4(II) (listing eleven badges of fraud).

fraud and misrepresentation.").  The Trustee further alleges, and the Court takes judicial notice of the fact, that Farah has pled guilty to a crime for his activities in connection with FRM and CLM.  Id.

Courts have found that "the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors."  Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC), 440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) (citing In re Bayou Group, LLC, Nos. 0622306(ASH), 2010 WL 3839277, at *15 n.19 (S.D.N.Y. Sept. 17, 2010) ("[W]here a Ponzi scheme exists, there is a presumption that transfers were made with the intent to hinder, delay and defraud creditors."); Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 8 (S.D.N.Y. 2007) ("[T]ransfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.") (internal quotations omitted); Quilling v. Stark, No. 05CV1976 (L), 2006 WL 1683442, at *6 (N.D. Tex. June 19, 2006) ("The existence of a Ponzi scheme as alleged in the complaint makes the transfer of investor funds fraudulent as a matter of law.")); see also Gowan v. The Patriot Group, LLC (In re Dreier LLP), Bankr. No. 09-15051(SMB), Adv. No. 10-03524(MG), 2011 WL 2412581, at *24 (Bankr. S.D.N.Y. June 16, 2011) ("Courts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme.").  While the Complaint does not contain the term "Ponzi scheme," the Court takes judicial notice of other pleadings in the case that have described Farah's activities that way.  See, e.g., Notinger v. Tebbe (In re Fin. Res. Mortg., Inc.), Adv. No. 09-1184-JMD, Doc. Nos. 1 and 100.  Accordingly, the Court finds that the allegations in the Complaint satisfy the requirements for pleading actual fraud under § 548 and RSA 545-A.

### 3. Defrauding Creditors

The Migliaccios argue that the Trustee failed to allege that there was actual intent to defraud "a creditor" and therefore Counts II and III should be dismissed. The Migliaccios make a distinction between defrauding "creditors" and defrauding beneficiaries of the trust, or FRM and CLM victims (who became creditors by the fraudulent acts). Viewing the Complaint in the light most favorable to the Plaintiff, the Court concludes that the allegations are sufficient to satisfy this element of the Trustee's claim under § 548 and RSA 545-A:4(I)(A). The Complaint alleges that "Farah began stealing money" from FRM and/or CLM no later than June 2005 and by that date FRM and CLM were insolvent. Complaint ¶¶ 10 and 11. At the time the transfers at issue were made, CLM and FRM did not have sufficient funds to cover the obligations that they were incurring or to return the funds collected from investors. Id. ¶ 11. The investors who were defrauded were creditors of FRM and CLM as they had claims for prepaid interest and/or the return of their funds if a particular loan did not close. The Migliaccios admit as much in their memorandum in support of the Motion. Doc. No. 56 at 19-20 ("The obligation to apply the funds in accordance with such terms created a debt owed by CLM to the Defendants which was discharged when funds in satisfaction of this requirement were transferred by CLM, funding the loans."). Thus, the Trustee has met his burden of pleading actual creditors.

### 4. Antecedent Debts, Depletion of Assets, and Reasonably Equivalent Value

The Migliaccios contend Counts II and III should be dismissed with regard to the Trustee's constructive fraud claims because, taking the Trustee's allegations as true, the transfers are not avoidable as (1) they were on account of antecedent debts; (2) they did not deplete the Debtors' assets to the detriment of creditors; and (3) the Debtors received reasonably equivalent value in exchange. The Court notes preliminarily that the Trustee has not made a constructive

fraud claim in Count III as the Complaint only makes reference to RSA 545-A:4(I)(a), which

contains the actual fraud provisions under New Hampshire's version of the UFTA.  See Felt

Mfg. Co., 371 B.R. at 608.  Thus, at issue is only the Trustee's claim under § 548(a)(1)(B) in

Count II of the Complaint.

 Under § 548(a)(1)(B), the Trustee must establish:

1. The Debtors did not receive reasonably equivalent value for the transfers; and

2. The Debtors were insolvent at the time of the transfers or became insolvent as a
result of the transfers; or

3. The property remaining with the Debtor was an unreasonably small capital; or

4. The Debtors would be unable to incur or pay debts as they became due; or

5. The Debtors made the transfers for the benefit of an insider.

11 U.S.C. § 548(a)(1)(B).  The Complaint makes the necessary allegations concerning the lack

of reasonably equivalent value as it states "CLM and/or FRM received no consideration for such

transfers."  Complaint ¶ 91.  The Complaint also states that at the time CLM made the transfers

"CLM was insolvent."  Id.  It states further that "CLM was engaged in a business for which any

property remaining was unreasonably small capital" which meets the pleading requirement of §

548(b)(1)(B)(ii)(II).  Id.  The Complaint also provides "CLM intended to incur and believed it

would incur debts beyond its ability to pay as such debts matured."  Id.  The Complaint explains

that "[a]fter June, 2005, CLM and FRM did not have sufficient funds to cover the obligations

each was incurring or to return the funds collected from . . . CLM and FRM."  Id. ¶ 11.

 The Migliaccios essentially dispute the Trustee's allegations.  They contend that the

transfers did not deplete the Debtors' assets.  They further contend that the Debtors did in fact

receive reasonably equivalent value in exchange for the transfers as they were in satisfaction of

antecedent debts.  The Migliaccios are setting forth their defenses to the Trustee's constructive

fraud claim.[6]  Some defenses may be appropriately considered at the motion to dismiss stage.

Dreier, 2011 WL 2412581, at *27; see also Felt Mfg. Co., 371 B.R. at 608 ("Dismissing a case

on the basis of an affirmative defense requires that (i) the facts establishing the defense are

definitively ascertainable from the complaint and the other allowable sources of information, and

(ii) those facts suffice to establish the affirmative defense with certitude.") (quotations omitted).

Here, determining whether adequate consideration was received and whether the Debtors were

insolvent, undercapitalized, or unable to pay their debts are factual inquiries that are

inappropriate at the motion to dismiss stage.  Notinger v. Costa (In re Robotic Vision Sys., Inc.),

374 B.R. 26, 59 (Bankr. D.N.H. 2007).  These are factual questions that may not be determined

on the face of the Complaint.

The Court notes, however, that there are cases that support the Migliaccios and hold that

each investor in a fraudulent investment scheme has a claim for fraudulent inducement against

the debtor which entitles the investor to restitution of its principal investment, with the restitution

claim constituting antecedent debt and therefore value within the meaning of § 548(d)(2)(A).

See Madoff, 445 B.R. at 226-27 ("[I]nnocent investors who reasonably believed that they were

investing in a legitimate enterprise are entitled to claims for restitution."); see also Levit v. R.T.

Milord Co. (In re Thunderdome Houston Ltd. P'ship), No. C 4615, 2000 WL 889846, at *8

(Bankr. N.D. Ill. June 23, 2000) ("[C]ourts have reasoned that because a Ponzi investor

immediately obtains a claim for restitution against the debtor upon making an investment by

---

[6]  The Court acknowledges that receipt of less than reasonably equivalent value is a prima facie
element of a constructive fraud claim and not an affirmative defense.  See In re Top Flight Stairs & Rails,
Ltd., 398 B.R. 321, 325 (Bankr. N.D. Ill. 2008) (citing Trunnell v. Brookshire, No. 06-6229 AER, 2007
WL 963337, at *2 n.9 (Bankr. D. Or. Mar. 28, 2007)).

virtue of the debtor's fraud, the claim constitutes a debt owed to the investor."). However, any such claim requires the investor to be an "innocent" investor. <u>Madoff</u>, 445 B.R. at 225-26. Such a determination may only be made on the evidentiary record established at a trial. Courts also have held that "when investors invest in a Ponzi scheme, any payments that exceed their principal investments are not made for reasonably equivalent value and can be recovered by the [t]rustee as fraudulent conveyances." <u>Id.</u> at 227; <u>see also</u> <u>Dreier</u>, 2011 WL 2412581, at *37 n.44 (indicating payments in excess of the amounts individuals have invested are voidable and recoverable by the trustee as fraudulent conveyances).

Thus, the Court concludes that at this early stage the Trustee has adequately pled a lack of reasonably equivalent value and the other required elements for a constructive fraud claim under § 548(a)(1)(B).

### 5. Specificity and Particularity Lacking

The Migliaccios argue that the Trustee has failed to allege the specifics of each transfer and has failed to plead with the particularity required by Rule 9(b) the Debtors' fraud and false representations. The Court notes first that "[c]laims for constructive fraudulent transfer need only satisfy the less rigorous requirements of Rule 8(a)." <u>Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)</u>, Bankr. No. 06-12737 (SMB), Adv. No. 07-2780, 2011 WL 309583, at *10 (Bankr. S.D.N.Y. Jan. 25, 2011); <u>see also</u> <u>Madoff</u>, 445 B.R. at 225 ("The heightened federal pleading standard for allegations of fraud does not apply to avoid transfers as constructively fraudulent."). As explained earlier in this opinion, the existence of a Ponzi scheme creates a presumption that the transfer of investor funds was fraudulent as a matter of law. The Court finds that the Complaint's allegations are thus sufficient to withstand the Motion in this regard.

**6. Existence of Actual Creditor**

The Migliaccios contends that the Trustee has failed to plead the existence of an actual creditor holding an allowable unsecured claim who, under New Hampshire law, could avoid the transfer in question.  They argue that Count III should be dismissed because the Trustee lacks standing to avoid transfers under § 544(b) due to his failure to plead an actual creditor.

"[A] trustee is not required to specifically identify a qualifying unsecured creditor in its complaint to assert standing under section 544 of the Code in accordance with the pleading requirements of Rule 8. . . . simply pleading the existence of an unsecured creditor generally will suffice to satisfy Rule 8(a)(2)."  Madoff, 445 B.R. at 234.  The Trustee's Complaint in this case makes sufficient allegations regarding the category of creditors on whose claims the Trustee bases his standing, i.e., the clearly defrauded customers of FRM and CLM.  See, e.g., Complaint ¶ 12 ("There were numerous investors in CLM and/or FRM who invested funds through CLM and FRM who received no real estate investment, mortgage or other purported asset of value as a result of their investments) and ¶ 91 ("CLM made each of the transfers with the actual intent to hinder, delay or defraud creditors of CLM and/or FRM . . .").  See also Madoff, 445 B.R. at 234.

**C.  Count IV**

In Count IV, the Trustee seeks to avoid various transfers as preferential pursuant to 11 U.S.C. § 547(b), which provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property–
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before the transfer was made;
> (3) made while the debtor was insolvent;
> (4) made–
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if–
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The Migliaccios argue that Count IV of the Complaint must be dismissed because the Trustee has failed to plead a required element of such a cause of action, i.e., that the transfers were of "an interest of the debtor in property."

The transfers that the Trustee seeks to avoid in Count IV are the payments of False Prepaid Interest and False Interest totaling $6,333.34 paid within ninety days of the petition date, i.e., paid between August 22, 2009, and November 19, 2009, and "any other transfers to the Migliaccios within 90 days prior to the petition."  Complaint ¶¶ 104 and 105.  The Migliaccios contend that the funds used to make the transfers consisted of lender funds held in trust by CLM and FRM and therefore did not consist of an interest of the Debtors in property, as required by § 547(b).  As explained above, reading the Complaint as a whole, and in the light most favorable to the Trustee, the Court concludes that the Trustee has sufficiently pled that the transfers at issue were "of an interest of the debtor in property."

### D.  Count V

The Migliaccios contend Count V of the Complaint must be dismissed because it is vague and fatally conclusory.  The Court agrees.  Count V contains only the assertion that a constructive trust should be imposed on property "[t]o the extent that the Defendants are in possession of any property of the Debtors which has or has not been discovered . . . by the Trustee."  Count V does not allege any facts nor connect facts already alleged to a legal theory upon which relief may be granted.  For that reason, Count V of the Complaint must be dismissed.

### E.  All Counts

The Migliaccios further argue that all counts of the Complaint should be dismissed because the Trustee is precluded from claiming any interest in the funds under the doctrine of in pari delicto.  The Trustee contends that the doctrine does not apply in this case.  "In pari delicto is both an affirmative defense and an equitable defense.  Broadly speaking, the doctrine prohibits plaintiffs from recovering damages resulting from their own wrongdoing."  Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006), cert. denied, 550 U.S. 918 (2007).  The doctrine is grounded on two principles.  First, where the plaintiff and the defendant are both responsible for wrongful actions, courts should not resolve disputes between them arising from the wrongdoing.  Id.  Second, denying relief to an admitted wrongdoer is an effective means of deterring illegality.  Id.  The in pari delicto defense is available to defendants in an action brought by a bankruptcy trustee whenever that defense would have been available by the debtor.  Id. at 153.  "After all, a trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than, those possessed by the debtor."  Id.

Courts have held that, while the in pari delicto defense applies to actions brought by trustees as the successor to the debtor's interests under § 541, it does not apply to avoidance actions under chapter 5.  See Kaliner v. MDS Sys. Corp., No. 2:09-MC-00005-JD, 2001 WL 203872, at *5 (E.D. Pa. Jan. 20, 2011) ("While the in pari delicto defense applies to actions brought by the trustee as successor to the debtor's interests under § 541, it does not apply to § 544 avoidance actions."); Gecker v. Goldman Sachs & Co. (In re Auto. Prof'ls, Inc.), 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008) ("Courts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code."); see also McNamara v. PFS (In re Pers. and Bus. Ins. Agency), 334 F.3d 239, 246-47 (3d Cir. 2003)

27

(holding that the fraudulent conduct of the owner of a corporate debtor was not imputed to the bankruptcy trustee in § 548 action); Corzin v. Fordu (In re Fordu), 209 B.R. 854, 863 (B.A.P. 6th Cir. 1997) (stating "courts have consistently recognized that the Trustee may pursue fraudulent or preferential transfers despite the fact that the debtor was a knowing and willing participant to such conveyances"); Kipperman v. Onex Corp., 411 B.R. 805, 881 (N.D. Ga. 2009) (concluding that in pari delicto should not be applied against a trustee in fraudulent transfer actions); World Capita Commc'ns, Inc. v. Island Capital Mgmt., LLC (In re Skyway Commc'ns Holding Corp.), 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008) (holding in pari delicto does not apply when a trustee brings an action pursuant to § 544).  Courts have reasoned that it is inequitable to impute a debtor's bad conduct to a trustee who comes to the court with clean hands to pursue claims on behalf of innocent creditors.  McNamara, 334 F.3d at 246-47; Kipperman, 411 B.R. at 881; see also Nisselson, 469 F.3d at 157 (noting that the trustee in that case was "not bringing claims on behalf of an innocent target of the fraud but, rather, on behalf of complicit party").

For that reason, the Court concludes that the Migliaccios' in pari delicto defense is not viable against the Trustee's claims for fraudulent and preferential transfers under §§ 544, 547, and 548 contained in Counts II, III, and IV of the Complaint.  While the defense may be applicable to the Trustee's claims in Counts I and V, the Court has already determined that those counts should be dismissed for other reasons.

## V.  CONCLUSION

Based on the foregoing, the Court shall enter a separate order (1) denying the Motion as to Counts II, III, and IV of the Complaint, and (2) granting the Motion and dismissing the

Complaint as to Counts I and V.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   July 8, 2011                    /s/ J. Michael Deasy
                                        J. Michael Deasy
                                        Bankruptcy Judge