**2012 BNH 001**

_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:

Financial Resources Mortgage, Inc. and
C L and M, Inc.,
and other jointly administered cases,
              Debtors

Steven M. Notinger, Chapter 7 Trustee for
Financial Resources Mortgage, Inc. and
C L and M, Inc.,
              Plaintiff

v.

Philip Migliaccio and
Melanie Migliaccio,
              Defendants

Bk. No. 09-14565-JMD
Bk. No. 09-14566-JMD
Chapter 7
Jointly Administered

Adv. No. 10-1075-JMD

*James W. Donchess, Esq.*
*Donchess & Notinger, PC*
*Nashua, New Hampshire*
*Attorney for Plaintiff*

*Bertrand A. Zalinsky, Esq.*
*Cronin & Bisson, P.C.*
*Manchester, New Hampshire*
*Attorney for Defendants*

## MEMORANDUM OPINION

## I.  INTRODUCTION

      Philip and Melanie Migliaccio (the "Migliaccios" or the "Defendants") have filed a

motion (Doc. No. 100) (the "Motion") seeking summary judgment in their favor on Counts II,

III, and IV of the second amended complaint (Doc. No. 48) (the "Complaint") filed by Steven M.

Notinger, the chapter 7 trustee (the "Trustee") for the bankruptcy estates of Financial Resources Mortgage, Inc. ("FRM") and C L and M, Inc. ("CLM") (collectively, the "Debtors").[1]  In the remaining counts of the Complaint the Trustee seeks to avoid various transfers as fraudulent within the meaning of 11 U.S.C. §§ 544(b) and 548 and NH RSA 545-A:4(I)(A) and/or preferential under 11 U.S.C. § 547.  For the reasons set forth in this opinion, the Motion shall be granted in part and denied in part.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, a summary judgment motion should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" if a reasonable jury could resolve the point in favor of the nonmoving party.  Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).  A fact is "material" if its existence or nonexistence has the potential to change the outcome of the suit.  Id.

> [T]he role of summary judgment is to "pierce the pleadings" and to determine whether there is a need for trial.  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st

---

[1]  The Court dismissed Counts I and V of the Complaint on July 8, 2011 (Doc. Nos. 91 and 92). Counts II, III, and IV are the only remaining counts of the Complaint.

2

Cir. 1990).  The moving party must "put the ball in play" by averring the absence of any genuine issue of fact.  Id. at 48.  Once the ball is in play, however, the non-moving party must come forward with competent evidence to rebut the assertion of the moving party.  Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Not every factual discrepancy is sufficient to defeat a motion for summary judgment.  "[E]vidence that 'is merely colorable or is not significantly probative'" cannot defeat the motion.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

Evans Cabinet Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 140 (1st Cir. 2010).  If the movant makes a preliminary showing that no genuine issue of material fact exists, the nonmovant must produce suitable evidence to establish a trialworthy issue.  Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006).  Otherwise, the nonmovant's failure to produce evidence on essential factual elements on which it would bear the burden of proof at trial requires summary judgment for the movant.  Id.  As part of the summary judgment record, a court may take judicial notice of its own docket.  See Fed. R. Bankr. P. 9017 (incorporating Fed. R. Evid. 201); LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999).

"In evaluating whether there is a genuine issue of material fact, the court examines the record–pleadings, affidavits, depositions, admissions, and answers to interrogatories–viewing the evidence in the light most favorable to the party opposing summary judgment."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  While courts draw all reasonable inferences in favor of the nonmovant, Mendez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011), courts afford no evidentiary weight to "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001), cited in Tropigas de Puerto Rico, 637 F.3d at 56.  Against this legal backdrop, the Court shall examine the summary judgment record and recite the facts in the light most agreeable

3

to the Trustee as the party opposing summary judgment.[2]  <u>Tropigas de Puerto Rico</u>, 637 F.3d at 54.

### B.  Summary Judgment Record

#### 1.  Background

Scott Farah ("Farah") formed FRM in 1989 and served as its principal.  FRM was in the mortgage brokerage business and arranged mortgages between borrowers and lenders for a commission.  FRM earned money by brokering residential, commercial, or private money transactions.  FRM typically charged a commission on every loan that it brokered, which ranged from 1-4% for conventional residential loans, 2-6% for conventional commercial loans, and 4-10% for private money loans.

Donald Dodge ("Dodge") formed CLM in 2005.  Dodge served as CLM's only officer and shareholder.  Farah was never an officer or shareholder of CLM and had no signatory authority on any of CLM's bank accounts.  CLM serviced many of the loans brokered by FRM.  CLM received its income from servicing the loans.  FRM paid a portion of its commissions to CLM for CLM's operating expenses.  On a regular basis, CLM sent an invoice to FRM stating which loans had closed and which loans CLM was now servicing.  FRM would send CLM a check that CLM would deposit into its operating account, Account 3304034880, which it maintained at Citizens Bank and called "CL and M Operating Account" (the "Operating Account").

---

[2]  The Migliaccios filed a Statement of Material Facts in Support of Defendants' Motion for Summary Judgment (Doc. No. 100) as required by LBR 7056-1(a)(1)(B).  The Trustee did not submit a separate response to this statement in the form required by LBR 7056-1(b)(1)(B) but rather included his own recitation of facts in his memorandum of law.  LBR 7056-1(b)(2) provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party."

Farah solicited both borrowers and lenders through referrals, advertisements, and direct mail.  FRM would process various loan requests and, two or three times a month, would send out summaries of all the loans that were available for funding to potential lenders, including the Defendants.  If a lender expressed interest in a particular loan, FRM would send a full underwriting package, including tax returns, appraisals, and credit reports.  Lenders could then choose whether or not to fund a particular loan.  The Defendants became lenders through such processes.  Once the Defendants decided to fund a particular loan, Farah instructed them to send their money to CLM.  Dodge would then deposit the money into one of two bank accounts: Account 3304037383, which it maintained at Citizens Bank and called "CL and M, Inc. Servicing Account" (the "Servicing Account") or Account 3304037448, which it also maintained at Citizens Bank and called "CL and M Servicing Account I" (the "Servicing Account I").  CLM also had the Operating Account, which it maintained separately from the two servicing accounts. The Operating Account was used to pay CLM's operating expenses, including wages for its employees, payments for credit cards and insurance, state and federal tax expenses, and bank charges.  The source of the funds for the Operating Account were servicing fees that were paid to CLM by FRM from loan origination fees.

When a lender sent funds to CLM, the lender would usually receive a letter from CLM outlining the terms of the deal.  Typically lenders would receive interest from the date CLM received the lenders' deposit through the date the loan closed.  Many loans called for an interest reserve whereby some of the loan proceeds due to the borrowers would be held by CLM after the closing to be disbursed each month post-closing to the lender.  Loans brokered by FRM were short-term loans, i.e., with loan terms of one or two years.  The loan disbursements and interest payments at issue in this proceeding were paid from either Servicing Account or Servicing

5

Account I.  During the relevant times in this proceeding, CLM used the two servicing accounts essentially as one account.  Deposits would be placed in one of the two servicing accounts. CLM would write checks out of one account for three months and then for the next three months, while the checks were clearing from the first account, CLM would write checks from the other account.  Every three months the active servicing account and the stagnant servicing account would "flip-flop."  According to Farah, CLM placed no significance as to whether checks were deposited into or withdrawn from Servicing Account versus Servicing Account I.  CLM made numerous transfers back and forth between the two accounts "purely for bookkeeping reasons."

### 2. The Defendants' Loans

In 2008, Mr. Migliaccio contacted FRM to obtain information about making loans. During that year the Migliaccios received numerous loan summaries from FRM.  In each case, the summary contained the term, interest rate, amount, and collateral description as well as the reason for the proposed loan.  When the Migliaccios chose a particular loan to fund, Farah directed that a check made payable to CLM Servicing be sent to CLM.  In accordance with those instructions, the Migliaccios then sent checks made payable to "CLM Servicing" or "CL&M Servicing" for each loan.  The checks included a notation on the memo line of each check indicating which loan the money was intended to fund.

### a. Hopkins Loan

In March 2008, the Migliaccios received a loan summary for a loan to Eric Hopkins (the "Hopkins Loan").  The loan was for finishing construction on a duplex near Barrington, New Hampshire, and for paying off credit card debt.  The proposed loan term for the Hopkins Loan was one year and the proposed interest rate was 13%.  The Hopkins Loan had a six-month interest reserve.

6

The Migliaccios decided to fund the Hopkins Loan and sent a check to CLM dated March 7, 2008, made payable to CLM Servicing, in the amount of $126,500.00.  The check contained a notation on the memo line making reference to "Barrington, NH" loan.  The Migliaccios' check was deposited on March 10, 2008, into Servicing Account.

The Hopkins Loan closed on March 13, 2008.  Hopkins executed a promissory note on that date with the Migliaccios named as payees.  The note was secured with a mortgage, also dated March 13, 2008, with the Migliaccios named as mortgagees.  The mortgage was recorded on March 14, 2008.

The Hopkins Loan was a construction loan, and the specific contingencies, conditions, and procedures for disbursement of the funds were documented in the Hopkins Loan agreement.  Among other provisions, the Hopkins Loan agreement provided for the advancement of loan proceeds upon the submission of invoices and a written draw request.  The Migliaccios, as lenders, had the right to require an inspection of the work.  CLM was designated as servicer under the agreement.  Hopkins expressly set up the conditions of an escrow in the loan agreement and then funded the escrow at closing by leaving $109,894.01 with CLM at closing, which was indicated as "Loan In Progress" on the settlement statement.

With respect to the Hopkins Loan, CLM verified all receipts submitted for reimbursement, authorized inspections, and confirmed the work had been done.  In accordance with the Hopkins Loan agreement, Hopkins filled out a "Draw Request on Escrow" form as each condition and contingency was met in regard to the Hopkins Loan construction.  CLM, acting as the servicing agent, disbursed the funds and sent the Defendants an updated "Loan Master Report" showing the disbursements.  The "Loan Master Report" also indicated when inspections

had been paid for in connection with the Hopkins Loan agreement.  The "Loan Master Report" listed disbursements as "Trust Account Activity."

Hopkins received reimbursements from the Hopkins Loan in the amounts of $17,000.00, $25,482.86, and $11,665.34.[3]  During construction, the Defendants received six interest payments of $1,370.42 each for a total of $8,222.52.  Upon completion of the project on or about October 22, 2008, the remaining funds being held in escrow, $42,480.74, were cashed out by Hopkins.  CLM sent Hopkins a letter dated October 22, 2008, which stated in part, "We made your October payment from your escrow account balance.  There are no more payments built into your escrow account.  Therefore, the November payment is your responsibility."

By the end of October 2008, no funds were being held by CLM on behalf of the Hopkins Loan.  Each month thereafter, Hopkins sent CLM a personal check for $1,370.42, the amount of the monthly interest payment.  Upon receipt of the monthly interest payment, CLM disbursed a corresponding check to the Migliaccios, generally within one business day, along with a "Loan Master Report" showing all disbursements related to the account and the account balance. Between November 7, 2008, and March 11, 2009, Hopkins paid CLM a total of $6,852.10 ($1,370.42/mo. x 5 months), which interest payments CLM then forwarded on to the Migliaccios.

In approximately February 2009, the Migliaccios negotiated a modification and extension agreement directly with Hopkins and without any involvement of CLM or FRM.  As part of that agreement, Hopkins was required to pay the Migliaccios directly, which he began to do in April

---

[3]  In addition, CLM paid an inspection fee for $400.00 and made a payment to a supplier for $4,642.55.

2009.  As a result, CLM's services on the account were terminated.  The Migliaccios continue to hold the note and mortgage on Hopkins' property.

From the time the Migliaccios delivered funds for the Hopkins Loan in March 2008, until CLM's services were terminated in approximately March 2009, the Migliaccios received $15,074.62 in interest ($1,370.42/mo. x 11 months for post-closing interest) from CLM on account of the Hopkins Loan.  The Migliaccios did not receive any payments from CLM on account of the Hopkins Loan in the ninety days prior to the Debtors' bankruptcy filings.

### b.  Walker Loan

In April 2008, the Migliaccios received a loan summary for a loan to Gerald Walker (the "Walker Loan").  The Walker Loan was for paying off consumer debt and improving the borrower's credit score so the borrower could obtain conventional financing.  The proposed loan term for the Walker Loan was two years and the proposed interest rate was 14%.  The Walker Loan had a two-year interest reserve.

The Migliaccios decided to fund the Walker Loan and sent a check to CLM dated April 16, 2008, made payable to CL&M Servicing, in the amount of $82,000.00.  The check contained a notation in the memo line that referenced the collateral for the loan.  The Migliaccios' check was deposited on April 21, 2008, into Servicing Account I.

Upon receipt of the loan funds, CLM sent a letter to the Migliaccios dated April 21, 2008, confirming "a deposit from [them] for $82,000 towards lending on the Hilliard Island, Florida deal."  The letter explained that the Migliaccios would be earning 14% from April 21, 2008, until the date of closing and then 14% thereafter for twelve months.[4]  From the closing, the

---

[4]  The actual loan documents called for a twenty-four month interest reserve.

Migliaccios would receive a per diem payment and thereafter regular payments until the payoff date.

The Walker Loan closed on May 21, 2008.  Walker executed a promissory note on that date with the Migliaccios named as payees.  The note was secured with a mortgage, also dated May 21, 2008, with the Migliaccios named as mortgagees.  The mortgage was recorded on May 27, 2008.  In connection with the closing, the Migliaccios received $345.97 in per diem interest. CLM retained $22,960.00 for the interest reserve.  The Walker Loan agreement contained an addendum that stated in relevant part that "Borrower and Lender agree that the monthly payment amount of $956.67 shall be paid directly from the proceeds of the Loan for a period of twenty four (24) months.  Said amount shall be escrowed at the time of closing.  The aggregate of the escrowed payments shall be $22,960.00."

A document entitled "Draw Request On Escrow" was signed at closing in conjunction with the Walker Loan agreement.  Walker listed the specific payments he wanted withdrawn from the funds retained at closing by CLM, which Walker called "Escrowed Interest."  It appears that when Walker ran out of space on the document sufficient to write the list of payments, he drew an "X" through the lines and wrote "See Instructions below."  Walker then wrote in the space below the following borrower's instructions:

> Lender has held $22,960.00 as evidenced on line 109 of the settlement statement executed on May 21, 2008.  The purpose of the $22,960.00 ("Escrowed Interest") is for the interest payments to be paid on the loan beginning July 1, 2008.  Lender is hereby authorized to deduct from the Escrowed Interest monthly payments as required under the Note beginning July 1, 2008 and to continue such deductions for payment each month on the first day thereof until the term of the Note has been fulfilled unless Borrower pays of [sic] the Note prior to the due date, at which point any unearned portion of the Escrowed Interest shall be refunded to Borrower or provided in the form of a reduction of principal due on the Note.

Each month from July 2008, to October 2009, CLM disbursed to the Defendants $956.67 on behalf of the Walker Loan for interest for a total of $15,306.72 ($956.67/mo. x 16 months). With each payment, the Defendants received an updated "Loan Master Report." Each payment was listed on the "Loan Master Report" as a "Trust" distribution under "Account Activity" and the daily balance listed in the "Trust Account Activity" section decreased by $956.67 with each payment.

On January 11, 2011, a deed in lieu of foreclosure, executed by Walker and naming the Migliaccios as grantees, was recorded. The promissory note and mortgage were deemed paid in full and released.

From the time the Migliaccios delivered funds for the Walker Loan in April 2008, until CLM was put into bankruptcy in November 2009, the Migliaccios received $15,652.69 in interest payments ($345.97 in pre-closing interest and $15,306.72 in post-closing interest) from CLM on account of the Walker Loan. The Migliaccios received payments totaling $1,913.34 in the ninety days prior to the Debtors' bankruptcy filings.[5]

### c.  Inovlotska Loan

In May 2008, the Migliaccios received a loan summary for a loan to Fay Inovlotska (the "Inovlotska Loan"). The Inovlotska Loan was for the purchase of a commercial building in Corinth, New York. The proposed loan term for the Inovlotska Loan was one year and the proposed interest rate was 13%. The Inovlotska Loan had no interest reserve.

The Migliaccios decided to fund the Inovlotska Loan and sent a check to CLM dated May 20, 2008, made payable to CL&M Servicing, in the amount of $59,655.00. The check

---

[5]  The Migliaccios received monthly interests payments only for September and October during this period.

contained a notation in the memo line to the "Corinth NY Loan." The Migliaccios' check was deposited on May 27, 2008, into Servicing Account I.

Upon receipt of the loan funds, CLM sent a letter to the Migliaccios dated May 29, 2008, confirming "a deposit from [them] for $59,655 towards lending on the Inovlotska/Corinth, NY deal." The letter explained that the Migliaccios would be earning 13% from May 27, 2008, until the date of closing and then 13% thereafter for twelve months. From the closing, the Migliaccios would receive a per diem payment and thereafter regular payments until the payoff date.

The Inovlotska Loan closed on June 13, 2008. Inovlotska executed a promissory note on that date with the Migliaccios named as payees. The note was secured with a mortgage, also dated June 13, 2008, with the Migliaccios named as mortgagees. The mortgage was recorded on June 27, 2008. In connection with the closing, the Migliaccios received $382.33 in per diem interest.

There was no interest reserve for the Inovlotska Loan. Instead, Inovlotska sent a personal check to CLM each month in the amount of the monthly interest payment, i.e., $646.26. CLM disbursed from its own accounts a corresponding check to the Migliaccios generally on the same day along with a "Loan Master Report" showing all disbursements related to the Inovlotska Loan. Between July 30, 2008, and June 8, 2009, Inovlotska paid CLM a total of $7,108.86 ($646.26/mo. x 11 months) as servicer of the loan, which interest payments CLM forwarded to the Migliaccios as lenders.

In approximately June 2009, the Migliaccios negotiated a modification and extension agreement directly with Inovlotska. As part of that agreement, Inovlotska was required to pay the Migliaccios directly, which she began to do in July 2009. As a result, CLM's services on the

12

account were terminated.  The Migliaccios still hold the note and mortgage on the Inovlotska Loan.

Between the time the Migliaccios deposited funds for the Inovlotska Loan in May 2008, until CLM's services were terminated in June 2009, the Migliaccios received $7,491.19 in interest payments ($382.33 in pre-closing interest and $7,108.86 in post-closing interest) from CLM on account of the Inovlotska Loan.  The Migliaccios did not receive any payments from CLM on account of the Inovlotska Loan in the ninety days prior to the Debtors' bankruptcy filings.

### d.  Jokobola Loan

In July 2008, the Migliaccios received a summary for a loan to Jokobola (the "Jokobola Loan").  The Jokobola Loan was for the purchase of a rental property in Houston, Texas.  The proposed loan term for the Jokobola Loan was one year and the proposed interest rate was 13%.

The Migliaccios decided to fund the Jokobola Loan and sent a check dated July 7, 2008, made payable to CL&M Servicing, in the amount of $35,940.00.  The check contained a notation in the memo line to "Houston 35,940."   The check was deposited on July 14, 2008, into Servicing Account I.

Upon receipt of the loan funds, CLM sent a letter to the Migliaccios dated July 10, 2008, confirming "a deposit from [them] for $35,940 towards lending on the Jokobola/Houston, TX deal."  The letter explained that the Migliaccios would be earning 13% from July 10, 2008, until the date of closing and then 13% thereafter for twelve months.  From the closing, the Migliaccios would receive a per diem payment and thereafter regular payments until the payoff date.

The Jokobola Loan did not close.  On August 20, 2008, CLM sent the Migliaccios a letter stating:

> Since the Jokobola/Houston, TX deal could not be fully funded, this check will be the last one you will receive for this deal.  Your interest check for the period of July 10 through August 20, 2008 was calculated as follows: $35,940 @ 13% = per diem of $12.80/day x 42 days = $537.62[.]  I am returning the principal you loaned ($35,940) along with your interest check.

Enclosed with the letter was a check for $36,477.62.  The Migliaccios did not receive any payments from CLM on account of the Jokobola Loan in the ninety days prior to the Debtors' bankruptcy filings.

### e.  Sewell Loan

In July 2008, the Migliaccios received a summary for a loan to Chris and Janel Sewell (the "Sewell Loan").  The Sewell Loan was a refinance of an existing mortgage on property located in Lebanon, Maine.  The proposed loan term for the Sewell Loan was one year and the proposed interest rate was 13%.  The Sewell Loan had a one-year interest reserve.

The Migliaccios decided to fund the Sewell Loan and sent a check to CLM, dated July 22, 2008, made payable to CL&M Servicing, in the amount of $108,000.00.  The check contained a notation in the memo line to "Lebanon, Maine House."  The check was deposited on July 25, 2008, into Servicing Account I.

Upon receipt of the loan funds, CLM sent a letter to the Migliaccios dated July 25, 2008, confirming "a deposit from [them] for $108,000 towards lending on the Sewell/Lebanon, ME deal."  The letter explained that the Migliaccios would be earning 13% from July 25, 2008, until the date of closing and then 13% thereafter for twelve months.  From the closing, the Migliaccios would receive a per diem payment and thereafter regular payments until the payoff date.

The Sewell Loan closed on August 14, 2008.  The Sewells executed a promissory note on that date with the Migliaccios named as payees.  The note was secured with a mortgage, also dated August 14, 2008, with the Migliaccios named as mortgagees.  The mortgage was recorded.

In connection with the closing, the Migliaccios received $692.38 in per diem interest.  CLM retained $14,040.00 for the interest reserve.  An addendum to the Sewell Loan agreement stated in part, "Pursuant to paragraph 1 of the Commercial Loan Agreement a portion of the funds advanced under this Agreement may be used by Borrower to pay administrative and other related costs incurred in this transaction.  Borrower and Lender agree that the monthly payment amount of $1170.00 shall be paid directly from the proceeds of the Loan for a period of twelve (12) months.  Borrower hereby authorizes the Lender and any future holder of the Note or successor in interest to Lender and any servicer of the Loan to pay the amount of $1170.00 to the holder of said note."  CLM was designated as "Servicer" in the Sewell Loan agreement.  On the Sewell settlement statement, $14,040.00 was withheld with the notation "Interest Reserves to CL&M, Inc."

Each month from October 2008, to September 2009, CLM disbursed to the Defendants $1,170.00 on behalf of the Sewell Loan for a total of $14,040.00 ($1,170.00/mo. x 12 months). Each payment was listed on a "Loan Master Report," which was sent to the Defendants, as a "Trust" distribution under "Account Activity" and the daily balance listed in the "Trust Account Activity" section decreased by $1,170.00 with each payment.

On December 4, 2009, the Sewells paid the Migliaccios all principal and interest due under the note and mortgage, totaling $111,783.00.  The Migliaccios then executed and delivered a discharge of the mortgage.

Between the date the Migliaccios funded the Sewell Loan in July 2008, through September 2009, the Migliaccios received $14,732.38 in interest payments ($692.38 in pre-closing interest and $14,040.00 in post-closing interest) from CLM on account of the Sewell

Loan.  The Migliaccios received payments totaling $1,170.00[6] in the ninety days prior to the

Debtors' bankruptcy filings.[7]

### 3.  Farah's Line of Credit

Between the time CLM was formed in 2005 until it closed in November 2009, CLM

advanced funds to Farah on a regular basis via a line of credit.  Farah executed a "Discretionary

Line of Credit Agreement and Promissory Note" dated June 1, 2005 (the "Stolen Funds

Promissory Note"), in the principal amount of $10 million, which permitted Farah to draw on the

line of credit up to the $10 million amount.  These advances were used by Farah for a variety of

purposes, including (1) FRM's purchase of its shareholders' preferred stock, which was worth

about $3 million; (2) paying off about $2 million FRM owed on several promissory notes; (3)

paying for FRM's ongoing business operations; and (4) making investments.

In addition to executing the Stolen Funds Promissory Note, Farah also pre-signed some

notes in series so that Dodge could fill in the amount Farah borrowed every time Farah made a

draw on the line of credit.  By November 5, 2009, the debt had grown to $20,348,321.43 as

shown in a "Note in Series" dated November 5, 2009, which had attached to it a schedule of

advances CLM made to Farah between June 27, 2005, to November 2, 2009.  Farah has

acknowledged that he was borrowing money that was not his to borrow and Dodge was lending

money that was not his to lend.  Both Farah and Dodge pleaded guilty to criminal fraud and have

been sentenced to serve prison terms.  As a result of this misappropriation of funds, CLM did not

---

[6]  The Migliaccios received monthly interests payments only for September during this period.

[7]  The Migliaccios also sent additional funds to CLM in 2008 and 2009 in the form of three
checks: one dated September 15, 2008, for $70,000.00; a second dated November 14, 2008, for
$50,000.00, and a third dated November 2, 2009, for $49,500.00.  These funds were for additional loans.
The loan for $70,000.00 closed but was sold unbeknownst to the Migliaccios resulting in uncertain title.
The other two loans did not close.  The Trustee is not seeking to avoid any transfers related to these loans.

have sufficient funds to cover all of its obligations.  Accordingly, as is typical in a Ponzi scheme, money deposited by lenders to fund a particular loan was not always used to fund that particular loan and was likely used to fund other lenders' loans and for payments to others.  When FRM was no longer able to obtain new lenders and money to fund loans, the Debtors ran out of money.

### 4. Bankruptcy

In early November 2009, FRM and CLM ceased operations.  Involuntary bankruptcy petitions were filed against them on November 20, 2009.  On November 23, 2009, Steven Notinger was appointed bankruptcy trustee.  On July 7, 2010, the Trustee sued the Migliaccios seeking to recover all transfers and payments made to the Migliaccios on account of the Hopkins Loan, the Walker Loan, the Inovlotska Loan, the Jokobola Loan, and the Sewell Loan (collectively, the "Migliaccio Loans").

### C. Analysis

The Trustee seeks the avoidance of various transfers by CLM and/or FRM[8] as fraudulent under 11 U.S.C. § 548 in Count II of the Complaint.  He seeks the avoidance of those same transfers as fraudulent under 11 U.S.C. § 544(b) and NH RSA 545-A:4(I)(A) in Count III of the Complaint.  The Trustee seeks the avoidance of various transfers by CLM and/or FRM as preferential under 11 U.S.C. § 547(b) in Count IV of the Complaint.  The Trustee seeks to recover any transfers avoided under §§ 544, 547, or 548 pursuant to 11 U.S.C. § 550.  The

---

[8]  While the Trustee seeks to avoid transfers made by "CLM and/or FRM" in Counts II, III, and IV of the Complaint, the summary judgment record makes clear that none of the transfers at issue in this case were made by FRM or consisted of "an interest of FRM in property" as required by the Bankruptcy Code as all money flowed through CLM's servicing accounts–no money flowed through FRM's bank accounts.  For that reason, the Court hereafter will only focus on whether the transfers consisted of "an interest of CLM in property."  The Court shall grant summary judgment to the Migliaccios to the extent claims are being asserted by the Trustee on behalf of the bankruptcy estate of FRM.

Complaint does not identify the transfers the Trustee seeks to avoid with precision; it appears,

however, that the transfers at issue include:

1. CLM's payment of pre-closing interest to the Migliaccios on account of the Migliaccio Loans.  These payments total $1,958.30 per the summary judgment record.

2. CLM's payment of $35,940.00 to the Migliaccios on account of the Jokobola Loan that never closed.

3. The notes and mortgages the Migliaccios received from the borrowers upon the closing of the Hopkins Loan for $126,500.00, the Walker Loan for $82,000.00,[9] and the Inovlotska Loan for $59,655.00.[10]

4. CLM's payment of post-closing interest to the Migliaccios on account of the Migliaccios Loans, whether such interest was reserved under the relevant loan agreements or whether it was paid by the borrower to CLM and then forwarded by CLM to the Migliaccios.  These payments total $51,530.20 per the summary judgment record.

5. The Sewell's postpetition payment of $111,783.00 to the Migliaccios in full satisfaction of the Sewell Loan.[11]

In order to recover on each of these counts the Trustee must establish a common element,

i.e., that each of the transfers he seeks to avoid was of "an interest of the debtor in property."  11

---

[9]  The Complaint makes no mention of the fact that, postpetition, Walker executed a deed in lieu of foreclosure and the Walker Loan has been deemed paid in full.

[10]  Presumably the Trustee seeks to avoid and recover the value of these notes and mortgages from the Migliaccios as subsequent transferees of property that was initially transferred from CLM to the borrowers.

[11]  Again, presumably the Trustee seeks to avoid and recover the amount the Sewells paid to the Migliaccios, in full satisfaction of the note, from the Migliaccios as subsequent transferees of property that was initially transferred from CLM to the Sewells.

U.S.C. §§ 544(b)(1), 547(b), and 548(a)(1);[12] see Daly v. Kennedy (In re Kennedy), 279 B.R.

455, 458 (Bankr. D. Conn. 2002).

### 1. Burden of Proof

The Trustee has the burden of proving this element, i.e., that what was transferred was

"an interest of the debtor in property," in each count.  Jenkins v. Chase Home Mortg. Corp. (In

re Maple Mortg., Inc.), 81 F.3d 592, 596 (5th Cir. 1996) (stating the trustee has the burden of

proving the elements of both preferential and fraudulent transfers, but acknowledging that in

cases where the debtor has unfettered discretion over funds purportedly held in a constructive

trust that the burden of proof shifts to the party asserting the existence of the trust to establish the

trust's existence); Schwartz v. Pennsylvania Dep't of Revenue (In re Miller's Auto Supplies,

Inc.), 93 B.R. 342, 344 (E.D. Pa. 1988) (holding the trustee has the burden of proving by a

preponderance of the evidence that the money transferred constitutes "an interest of the debtor in

property" under § 547); McHale v. Boulder Capital LLC (In re The 1031 Tax Group, LLC), 439

B.R. 47, 70 (Bankr. S.D.N.Y. 2010) (stating the trustee has the burden of proving transfers of

---

[12] Section 548(a)(1) of the Bankruptcy Code, which forms the basis of Count II, states in
pertinent part and with emphasis added:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . or any
> obligation . . . incurred by the debtor, that was made or incurred on or within 2 years
> before the date of the filing of the petition . . . .

Section 544(b)(1), which forms the basis of Court III, states in pertinent part and with emphasis added:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of
> the debtor in property or any obligation incurred by the debtor that is voidable under
> applicable law . . . .

Section 547(b), which forms the basis of Count IV, states in pertinent part and with emphasis added:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any
> transfer of an interest of the debtor in property . . . .

"an interest of the debtor in property" under § 548); Lovett v. Horich Inc. (In re Philip Servs. Corp.), 359 B.R 616, 625 (Bankr. S.D. Tex. 2006) (stating the trustee has the burden of proving that the money transferred was property of the estate in an action under § 547); but see Taxel v. Vaca (In re San Diego Realty Exch., Inc.), 132 B.R. 424, 428 (Bankr. S.D. Cal. 1991) (stating that a party who alleges that property was held in trust has the burden of showing the trust relationship so as to prevent the avoidance of any transfer of that property under § 547).  For a further discussion of the parties' burden of proof in this case, see below.

### 2.  An "Interest of the Debtor in Property"

The Bankruptcy Code does not define the phrase "an interest of the debtor in property." Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.), 315 B.R. 259, 272 (Bankr. E.D.N.Y. 2004).  Courts have concluded, however, that the term is equivalent to the term "property of the estate" under 11 U.S.C. § 541.  See Begier v. Internal Revenue Serv., 496 U.S. 53, 59-60 (1990); AppOnline.com, 315 B.R. at 272.  Courts turn then to § 541 in order to determine the scope of property interests that are recoverable under §§ 544, 547, and 548.  See Begier, 496 U.S. at 59-60; Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 600 (B.A.P. 2d Cir. 2000); AppOnline.com, 315 B.R. at 272; Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 342 (Bankr. S.D.N.Y. 1999).  As the Supreme Court has explained:

> Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate–the property available for distribution to creditors–"property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.

Begier, 496 U.S. at 59.  "Conversely, property that would not have been property of the estate cannot be recovered."  AppOnline.com, 315 B.R. at 272 (quoting Regency Holdings (Cayman),

Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998)).

Section 541(a)(1) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1) (emphasis added).  Section 541(d) operates to limit the extent of the estate's interest in property in which the debtor holds "only legal title and not an equitable interest."  11 U.S.C. § 541(d); Weiner v. A.G. Minzer Supply Corp. (In re UDI Corp.), 301 B.R. 104, 110 (Bankr. D. Mass. 2003).  In such situations property belongs to the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d); UDI Corp., 301 B.R. at 110.  The Court notes that some cases state or suggest that if a debtor does not hold an equitable interest in property, e.g., property held in trust, then such property is not property of the estate.  See Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 851 (6th Cir. 2002) (indicating that funds held in attorney escrow accounts were "not part of the estate in bankruptcy" and therefore did not constitute "an interest of the debtor in property" under § 548); Bavely v. Powell (In re Baskett), 219 B.R. 765, 762 (B.A.P. 6th Cir. 1998) ("Property held by a debtor as a trustee pursuant to an express trust is not property of the bankruptcy estate."); Kennedy, 279 B.R. at 458 ("[F]unds held in trust by a debtor are not property of his bankruptcy estate or, for the specific purposes of Code Section 548 . . . , property of the debtor.").  In the Court's view, however, it is more accurate to state that, while such equitable interests are not property of the estate, the debtor's legal interest in the property is property of the estate.  See Connecticut Gen. Life Ins. v. Universal Ins. Co., 838 F.2d 612, 618 (1st Cir. 1988) ("When a debtor is in possession of property impressed by a trust–express or constructive–the bankrupt estate holds the property

21

subject to the outstanding interest of the beneficiaries."); Schick, 234 B.R. at 342 ("If a debtor holds only legal title to the property, that is all that vests in the estate.").

Determining a debtor's property rights is a matter of state law.  Butner v. United States, 440 U.S. 48, 54 (1979); see Connecticut Gen. Life Ins., 838 F.2d at 618.  Accordingly New Hampshire law determines whether CLM had an interest in the property that was transferred to the Migliaccios.  It is undisputed that the Migliaccios delivered funds to CLM which CLM then deposited into Servicing Account or Servicing Account I.  At the time CLM transferred funds to Hopkins, Walker, Inovlotska, and the Sewells, and the Migliaccios received notes and mortgages in connection with the Migliaccio Loans, CLM held legal title to the funds that were transferred as they were being held in either Servicing Account or Servicing Account I.  At the time CLM transferred funds to the Migliaccios, in the form of either pre-closing or post-closing interest on the Migliaccio Loans, CLM held legal title to the funds as they were being held in either Servicing Account or Servicing Account I.  At the time CLM returned funds to the Migliaccios for the Jokobola Loan, CLM held legal title to the funds as they were being held in either Servicing Account or Servicing Account I.

Money held in a bank account in the name of a debtor is presumed to be property of the estate.  The 1031 Tax Group, 439 B.R. at 70; Millard Refrigerated Servs., Inc. v. Landamerica 1031 Exch. Services, Inc. (In re Landamerica Fin. Group, Inc.), 412 B.R. 800, 809 (Bankr. E.D. Va. 2009); San Diego Realty Exch., 132 B.R. at 429.  To rebut this presumption, a party must show that it retained some right to the funds.  Landamerica Fin. Group, Inc., 412 B.R. at 810; see Gowan v. The Patriot Group, LLC (In re Dreier LLP), 452 B.R. 391, 421 (Bankr. S.D.N.Y. 2011) ("Because of this presumption, the defendant in an avoidance action involving a commingled account has the burden of proving that the debtor only held legal title.").  One way

to overcome the presumption that the equitable interest in a bank account is part of the estate is to show that the funds were being held in trust.[13]  San Diego Realty Exch., 132 B.R. at 428 (making reference to constructive trusts).  The burden of proving the existence of an express trust is on the party asserting its existence.  Brockway Pressed Metals, Inc. v. Eynon Assocs., Inc. (In re Brockway Pressed Metals, Inc.), 363 B.R. 431, 440 (Bankr. W.D. Pa. 2007) (under Pennsylvania law); Landamerica Fin. Group, 412 B.R. at 812 (under Virginia law).  Thus, the Migliaccios have the burden of establishing that they retained some equitable interest in the funds CLM transferred.

### 3.  Was Money Held in Trust?

The Migliaccios contend that the money they sent to CLM, which was deposited into Servicing Account and Servicing Account I, was being held in trust by CLM as trustee to be used for their benefit to fund particular loans brokered by FRM.  The Migliaccios also contend that money reserved from particular closings on the Migliaccios Loans to pay interest to them on those loans was also being held by CLM as trustee.  The Migliaccios do not dispute that their funds were commingled in Servicing Account and Servicing Account I with the funds of other similarly situated lenders.  They contend that the funds in Servicing Account and Servicing Account I were not commingled with any funds of CLM.  The summary judgment record supports their contention.  However, the summary judgment record does not support a broader

---

[13]  "In a trust relationship . . . the law actually divides the bundle of rights in the property, and only when legal title to the property is held by the bankrupt in trust for the benefit of another is the property properly excluded from the bankrupt's estate."  Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg., Inc.), 81 F.3d 592, 596 (5th Cir. 1996).  As noted above, the trust property is not per se excluded from a bankruptcy estate but rather only the equitable interest is excluded.

conclusion that only the funds of the Migliaccios and other similar lenders were held in the

servicing accounts.[14]

At issue is whether a trust relationship existed between the Migliaccios and CLM.

A trust is a fiduciary relationship in which one person, the trustee, holds the legal title to property subject to a fiduciary duty to deal with or use the property for the benefit of another, the beneficiary. See Restatement (Third) of Trusts § 2 (2003). The trust arises as a result of a manifestation of an intention to bring it into existence by its creator, the "settlor." Id. Accordingly, every express trust has a settlor, a trustee and a beneficiary. Id. In addition, every trust must have trust property, or a trust res, which is held by the trustee for the beneficiary. Id.

Technical language or formalities are not necessary in order to create an express trust in New Hampshire. See Trustees of Pembroke Acad. v. Epsom Sch. Dis., 75 N.H. 408 (1910). The intention of the parties is the key. Id. There only needs to be an agreement between the parties expressed either in writing, orally or by the conduct of the parties. Woburn Nat'l Bank v. Woods, 77 N.H. 172, 174 (1914). Unless the trust res consists in whole or in part of real estate, an express trust need not be in writing and can be proven by parole evidence. Barrett v. Cady, 78 N.H. 60, 66 (1915).

It is clear to the Court that in order to create an express trust in New Hampshire there must be a proper manifestation of the intention to do so, either by the settlor or in communications between the settlor and the intended trustee. The settlor must make a transfer of the trust property to the trustee.

Hanley v. Notinger (In re Charlie's Quality Carpentry, LLC), 2003 BNH 025, 8-9; see

Askenaizer v. Seacoast Redimix Concrete, LLC (In re Charwill Constr., Inc.), 391 B.R. 7, 13

(Bankr. D.N.H. 2007) ("[T]o create a trust, although technical language and formalities are not

required, there must be intent to create the trust by the parties."). In determining whether a party

intended to create a trust or, instead, a debt, the test is whether the party intended for the person

---

[14]  The Trustee states that the servicing accounts also received deposits from FRM and other jointly administered debtors–the bankruptcies of FRM and CLM were followed by bankruptcy filings by Farah, his wife Susan Farah, a family trust known as SMM 2007 Realty Trust, Dodge Financial Inc., Northview Drive 1995 Trust, and nearly one hundred other trusts that were formed by the Debtors and/or Dodge Financial, Inc. to hold mortgages funded by investors who in turn received beneficial interests in the trusts. The summary judgment record lacks evidence, however, that would support a conclusion that CLM deposited or withdrew any of its funds from the servicing accounts.

receiving the money to have a beneficial, as well as a legal, interest in it.  <u>Dreier LLP</u>, 452 B.R. at 421; <u>State of New Jersey v. Atl. City Elec. Co.</u> 128 A.3d 861, 865 (N.J. 1957) ("Whether a trust or debt is created when one party pays money to another primarily depends upon their intention.").  In determining whether a trust has been created and its terms, courts must examine not just the settlor's intention but the settlor's "manifestation of intention."  <u>Dreier LLP</u>, 452 B.R. at 422 (quoting 1 Scott and Ascher on Trusts, § 4.1).  If the language of the parties fails to indicate the existence of an express trust, courts must then turn to the facts and circumstances surrounding the transaction and the parties' relationship to determine whether a trust exists.  <u>In re Kulzer Roofing, Inc.</u>, 139 B.R. 132, 140 (Bankr. E.D. Pa. 1992).

It is undisputed that there was no written trust agreement between the Migliaccios and CLM.  Rather, the Migliaccios contend that the parties' conduct demonstrates the existence of a trust.  For that reason the Court will review the summary judgment record to determine whether the Migliaccios have established the existence of a trust.

### a.  Factors Supporting Existence of Trust

#### i.  CLM's Actions in Having Funds Deposited into and Withdrawn from Segregated Accounts

The commingling of trust funds with general revenues usually indicates a debtor-creditor relationship.  <u>Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)</u>, 997 F.2d 1039, 1060 (3d Cir. 1992).  "The incompatibility of commingling funds and a trust relationship flows from the general precept that a trustee, through its legal owner, administers the trust's <u>res</u> according to the terms of the trust for the benefit of another and, hence, does not use the <u>res</u> for the trustee's own benefit."  <u>Kulzer Roofing</u>, 139 B.R. at 140.  It is black letter law, however, that the commingling

of funds in a trust account does not destroy or alter the nature of the deposited funds.  Dreier
LLP, 452 B.R. at 419.

      The summary judgment record establishes that CLM held funds received from the
Migliaccios in segregated accounts, which it named "CL and M, Inc. Servicing Account" and
"CL and M, Inc. Servicing Account I."  The summary judgment record contains no evidence that
CLM used these servicing accounts to fund CLM's operations, e.g., for the payment of employee
wages, taxes, insurance, credit cards, or bank charges.  Rather, CLM paid its business expenses
from the Operating Account.  The Operating Account was funded with revenue from servicing
fees, which were paid by FRM and deposited into the Operating Account.  Servicing Account
and Servicing Account I appear to have been used primarily to hold money in connection with
the funding and servicing of loans for third parties.  Accordingly, CLM's actions–in holding
monies, transferred to it by or for the benefit of the Migliaccios, solely in the servicing
accounts–supports a finding that CLM intended to hold the money in those commingled accounts
for the benefit of the Migliaccios.

### ii.  Parties' Course of Dealing in Connection with the Funding of the Migliaccio Loans

      The summary judgment record establishes that the Migliaccios delivered funds to CLM
in the form of checks once they decided to fund a loan after having reviewed loan summaries
provided to them by FRM.  The Migliaccios placed a notation on each check indicating which
loan the money was intended to fund.  Farah confirmed in his deposition that "[a]nytime
anybody sent money to CL&M it was supposed to be for a particular loan" and "[t]hey only sent
money in when they were funding a specific transaction, and when I had pitched a specific
transaction to a lender, and they were sending in specific dollars."  Upon receipt of the checks,

CLM deposited them into either Servicing Account or Servicing Account I.  With respect to four of the Migliaccio Loans, the Migliaccios received a confirmation letter acknowledging its receipt of funds for a specific loan; no letter was sent with respect to the Hopkins Loan as the loan closed just three days after CLM's receipt of the funds.

When each of the Migliaccio Loans closed, the dollar amount received by the borrower at closing matched the exact amount that the Migliaccios had delivered to CLM.  The loans all closed within thirty days, corroborating the Defendants' contention that CLM timely fulfilled its fiduciary duty to transfer the loan proceeds to the borrowers in accordance with the parties' intent to create a trust arrangement.

With respect to the Jokobola Loan that did not close, the Migliaccios were asked what they wanted done with the deposit they had made for lending on this deal.  The Migliaccios requested that the money be returned to them.  CLM returned the advanced funds on August 20, 2008.  This also supports the Migliaccios' contention that the Migliaccios did not intend for CLM to have any beneficial interest in the money.  CLM was not going to just hold the money while the Migliaccios located another deal to fund.

### iii. Conduct in Connection with Payment of Post-closing Interest

#### a. Interest Paid through Reserves

Once the Migliaccio Loans closed, interest on the loans became due and payable to the Migliaccios.  The Hopkins Loan, the Walker Loan, and the Sewell Loan all called for interest reserves.  The Hopkins Loan provided for a six-month interest reserve.  In accordance with the Hopkins Loan agreement, CLM made six monthly payments in the amount of $1,370.42 to the Migliaccios.  The Walker Loan provided for a two-year interest reserve.  In addition to the

Walker Loan agreement, Walker signed a "Draw Request On Escrow" form at the closing which listed the specific payments he wanted withdrawn from the funds retained by CLM at closing, which payments were labeled "Escrowed Interest."  As agreed by the parties, CLM made monthly payments in the amount of $956.67 to the Migliaccios on account of the Walker Loan until CLM halted operations in November 2009.  The Sewell Loan provided for a twelve-month interest reserve.  The Sewell Loan agreement contained an addendum that specifically provided for the retention and payment of interest.  In accordance with the Sewell Loan agreement and addendum, CLM made twelve monthly payments in the amount $1,170.00 to the Migliaccios.  In accordance with CLM's servicing of the loans, CLM generated "Loan Master Reports" for each of these loans.  The "Loan Master Report" for each loan reflected the monthly interest payments as a debit in the "Trust" column of the "Account Activity" section of the report.  Altogether these actions suggest that CLM was treating the interest reserve payments as trust monies from the borrowers held for the benefit of the Migliaccios under the promissory notes payable to them.

### b.  Interest Paid by Borrowers

The Inovlotska Loan did not provide for any interest reserves.  Instead, Inovlotska was required to make monthly payments to CLM as servicer each month.  Inovlotska made payments to CLM each month in the amount of $646.26.  CLM deposited the money into one of the servicing accounts and then forwarded the interest to the Migliaccios with one of its checks generally on the same day it received the interest payment from Inovlotska.

The Hopkins Loan called for only a six-month interest reserve.  After that period, Hopkins was required to make payments to CLM as servicer each month.  Hopkins did so; he made payments to CLM each month in the amount of $1,370.42 until Hopkins and the Migliaccios negotiated a modification agreement and extension agreement in the spring of 2009.

Upon receipt of Hopkins' interest payments, CLM deposited the money into one of the servicing accounts and then forwarded the interest to the Migliaccios with one of its checks generally within one business day.

While CLM did not reference these payments as "Trust" payments in the "Loan Master Reports," it is clear from CLM's conduct in quickly transferring the borrowers' funds to the Migliaccios that CLM did not treat these interest payments as its own money but rather as the money of the Migliaccios.  Accordingly such activity supports the notion that the borrowers, CLM, and the Migliaccios intended such payments to be trust monies.  Nothing in the summary judgment record raises any material factual basis for a contrary conclusion.

Additionally the Court notes that the Migliaccios have also argued that CLM was acting as a "mere conduit" in connection with the payment of this interest and therefore the transferred funds did not consist of "an interest in the debtor in property."  UDI Corp., 301 B.R. at 111 ("In the so-called 'true conduit' cases, courts have held that property merely passing through the debtor is not property of the estate, that the Debtor arguably never acquires either 'bare legal' or equitable title, but simply a 'possessory' interest.") (internal quotations and citation omitted). The Court need not decide that issue at this point in time.

### b.  Factors Supporting Non-Existence of Trust

### i.  Payment of Interest Pre-closing

One of the hallmarks of a debtor-creditor relationship, as opposed to a trust relationship, is the payment of interest when one party permits another to use its money for a period of time. Columbia Gas Sys., 997 F.2d at 1060; Brockway Pressed Metals, 363 B.R. at 447.  "Where the recipient of money obligates himself to pay a fixed rate of interest, regardless of whether the money is invested and without reference to the rate of return which it yields, it is only reasonable

to expect, unless a contrary intention is clearly manifested by some other circumstance, the recipient is to have the beneficial as well as the legal interest. . . .  When a fixed rate of interest is paid . . . , there is a strong inference that the payee is entitled to use the money to suit his own convenience." Atl. City Elec. Co. 128 A.3d at 865.  "While in some circumstances the payment of interest may indicate a debtor-creditor relationship, it is by no means determinative." Owner Operator Indep. Drivers Ass'n v. Comerica Bank (In re Arctic Express Inc.), 636 F.3d 781, 796 (6th Cir. 2011); see In re Penn Cent. Transp. Co., 392 F. Supp. 960, 962 (E.D. Pa. 1975) ("Although not conclusive, the presence of a provision for the payment of interest indicates the presence of a debtor-creditor relationship."); Atl. City Elec. Co. 128 A.3d at 869 ("As to the agreement to pay interest it is, of course, a factor in determinating the relationship between the parties but is by no means dispositive.").

The summary judgment record reflects that the Migliaccios were promised pre-closing interest on the Migliaccio Loans and were in fact paid pre-closing interest in the total amount of $1,958.30 ($345.97 in connection with the Walker Loan, $382.33 in connection with the Inovlotska Loan, $537.62 in connection with the Jokobola Loan, and $692.38 in connection with the Sewell Loan).  The payment of pre-closing interest suggests that the Migliaccios' money was not being held in trust as such interest was being paid prior to the money being invested in connection with the Migliaccios Loans.  As the cases above indicate, however, the payment of interest is not dispositive of the trust issue where it appears that a contrary intention is manifested by some other circumstance.

The summary judgment record supports a finding that one of the reasons interest was paid upon receipt of a lender's funds was to ensure that monies would be available for closing a particular deal.  In the past lenders sometimes failed to deliver funds in time for closing.  The

summary judgment record thus demonstrates some business reason for paying interest pre-closing.  In addition, the money to pay the pre-closing interest did not always come directly from deposits made by customers into the servicing accounts; rather, Farah testified at his deposition that sometimes the money came directly from CLM or, in situations where closings were delayed for some reason, the borrowers themselves.  The summary judgment record provides no basis for the Court to find that the payment of pre-closing interest from Servicing Account and/or Servicing Account I were distributions of monies held in trust for the Migliaccios.  However, the payment of such monies is not a sufficient factor in the overall conduct of the parties to require the Court to find that CLM and the Migliaccios did not intend that the money transferred to CLM by the Migliaccios be held in trust.

### ii.  Use of Funds for the Stolen Funds Promissory Note

Another factor in distinguishing between a trust relationship and an ordinary debt is whether or not the recipient of the fund was entitled to use the funds as his own or commingle them with his own funds.  Penn Cent. Transp. Co., 392 F. Supp. at 962.  "Commingling, standing alone, does not undermine a person's beneficial interest in trust property."  Kennedy, 279 B.R. at 461 n.8.

The summary judgment record supports a finding that CLM did not commingle in the servicing accounts any of its operating funds with those of its customers, both borrowers and lenders.  However, the servicing accounts may have contained not only lender and borrower monies in connection with particular loan transactions, but also monies of other third parties.  Even though CLM did not use the servicing accounts to fund its own operating expenses, it did use some of the funds in Servicing Account and Servicing Account I as its own when it permitted Farah to borrow from the accounts via the Stolen Funds Promissory Note.  This

conduct might suggest that the funds the Migliaccios and the borrowers placed in the servicing accounts were not being held in a trust.

Control over the use of funds, however, means the legal right to use the funds; it does not mean the ability to steal money or use it for personal purposes in breach of a duty.  Schick, 234 B.R. at 343; see also UDI Corp., 301 B.R. at 114 (noting that "control" over commingled funds for preference purposes means the "unfettered" right to use the funds).  While CLM's use of money from the servicing accounts to fund the Stolen Funds Promissory Note may suggest that CLM did not treat this property as trust property, in the context of the facts of this case, the Court does not find that this weighs against concluding that CLM's conduct with respect to the monies transferred by or to the Migliaccios reflects an intent to hold such monies in trust.  See UDI Corp., 301 B.R. at 114 (noting it would be "paradoxical" to elevate a bankruptcy debtor's legal interest in property to an equitable interest based on the bankruptcy debtor's unauthorized actions); Kennedy, 279 B.R. at 460 (Bankr. D. Conn. 2002) ("A thief does not acquire good title to the property he steals, nor can he convey good title to his transferees.").  There is no evidence that CLM, as trustee, exercised any other dominion or control over the servicing accounts.  Rather, it appears from the summary judgment record that the only inappropriate use of the money was when CLM gave money to Farah and possibly when it paid pre-closing interest.  CLM and Farah purported to document this removal of funds as a loan and kept a detailed list of how much was being "borrowed" by Farah.  Farah testified that it was his intent to pay the money back and that he had in fact paid some money back through the years.

### c. Trust Relationship Established

Considering all of the factors discussed above, the Court concludes based on the summary judgment record that a trust relationship existed between the Migliaccios and CLM

32

with respect to the transfers of money by them to CLM at issue in this case.  The Migliaccios were settlors who delivered money to CLM with the specific intention that the funds would be used to fund a particular loan which would be secured by particular collateral.  CLM served as trustee and held legal title to the money subject to a fiduciary duty to use the money for the Migliaccios' benefit.  A trust relationship also existed between the borrowers and CLM to the extent that some of the loan proceeds were retained and held by CLM, or paid to CLM post-closing, to fund monthly interest payments.  The borrowers, i.e., Hopkins, Walker, and the Sewells, were settlors who delivered money to CLM at closing, and in the case of Hopkins post-closing, with the specific intention that the funds would be used to make interest payments to the Migliaccios pursuant to the terms of the loan agreements, addendums, and escrow draw forms.  CLM held legal title to that money subject to a fiduciary duty to use the money for their benefit to pay their obligations to the Migliaccios.  CLM's conduct with respect to the interest payments in this case demonstrate its understanding of this duty.

### 4.  Is Tracing Required?

Proof of the intent to create a trust is not enough however.  Schick, 234 B.R. at 345. When, as in this case, the trust res has been commingled, the Defendants must also trace each and every payment to them in order to establish that they have an equitable interest in the monies transferred to them that is superior to the interest of CLM or any other party.  See id.; Carrozzella & Richardson, 247 B.R. at 600 (holding the alleged beneficiaries of funds held in trust by the debtor in a commingled account were required to trace the payments received by them from the debtor during the preference period in order to maintain their priority over the other unsecured creditors and retain the payments in the face of the trustee's avoidance proceeding); Philip Servs. Corp., 359 B.R at 628 ("The question is whether a trust beneficiary

can defeat a bankruptcy debtor's claim to funds by assertion of state law trust rights, and the courts that have considered the question . . . universally agree that the trust beneficiary must be able to trace the funds."); AppOnline.com, 315 B.R. at 272 ("It is well-settled that a claimant to trust property held by a debtor must be able to trace its funds in order to lay claim to property of the debtor.").  In order to establish rights as a trust beneficiary, the claimant must demonstrate: (1) the existence and legal source of a trust relationship; and (2) the identity of the trust fund or property and, where the trust fund has been commingled with property of a debtor, or others, sufficiently trace the property or funds, i.e., the res.  Connecticut Gen. Life Ins., 838 F.2d at 618.

The Migliaccios have the burden to trace their funds.  Schick, 234 B.R. at 343-44.  The Migliaccios have made no attempt to trace their funds as part of the Motion as they have argued in the Motion that tracing is not implicated under the facts of this case, where the servicing accounts were not commingled with CLM's own funds.  However, tracing is required because the Migliaccios must identify a trust res in order to defend the Trustee's claims.  The Migliaccios must establish that their money funded the Migliaccio Loans and related interest payments.  Because the Court is unable to trace the Migliaccios' trust funds on this summary judgment record, the Defendants' Motion must be denied in part on that basis.

To the extent the Migliaccios can prove that they deposited "trust funds" into CLM's bank accounts from which they were repaid, they have standing to assert the defense that the property they received was not an "interest of the debtor in property."  See Dreier LLP, 452 B.R. at 416-17.  The Defendants, however, cannot argue that they were paid with other customers' trust property "which is more likely in the circumstances of a Ponzi scheme."  Id. at 418; see The 1031 Tax Group, 439 B.R. at 61 (concluding prudential standing requirements barred defendants

in an avoidance action from claiming that the funds held by the debtors were held in trust for the benefit of third parties).

If the Migliaccios can demonstrate that the money they deposited with CLM was used to fund the Migliaccios Loans and to pay them interest, then they have a defense to the Trustee's assertion that the transfers were of "an interest in the debtor in property" and therefore the Trustee will not have met his burden on this element for each of his claims under §§ 544, 547 and 548 in the Complaint.  If the Migliaccios are only able to trace a portion of the funds used for a loan, then they would have a defense related to that portion of the promissory note and any proceeds of that note.  A change in form from funds in a bank account to a note does not affect the Migliaccios' establishment of a trust, so long as they can trace the funds into a note.  In re Comm'r of Banks and Real Estate, 764 N.E.2d 66, 101 (Ill. App. Ct. 2001).

The Court notes further that even if the Migliaccios are unable to trace the money they deposited with CLM, they have demonstrated to the Court that their funds were held in trust, i.e., that the equitable interest in the funds were held by them.  It also appears likely that the equitable interest in funds of other similarly situated lenders was held by those lenders and not by CLM. While the Migliaccios cannot assert as a defense that the other similarly situated lenders may have a beneficial interest in the funds, the Court notes that the Trustee may only be able to avoid the transfer of his legal interest in those funds, not the transfer of the equitable interests held by others.  Accordingly, any recovery by the Trustee on his avoidance claims may be only for the benefit of the trust beneficiaries and not for the benefit of the general creditor body.[15]  See

---

[15]  The Court recognizes that at least one court has questioned why a trustee would bring suit if he can only recover the debtor's legal interest in property (the equitable interest having been held by a non-debtor):  "Of what benefit to the estate is the debtor's fiducial legal title without recovery of the corresponding equitable interest, i.e. the money itself?  Certainly the bankruptcy trustee has no legitimate interest in recovering mere title to the beneficial property of others."  Kennedy, 279 B.R. at 459 n.5.

Connecticut Gen. Life Ins., 838 F.2d at 618 (recognizing that a bankruptcy estate holds trust

property subject to the outstanding interest of the beneficiaries); Baskett, 219 B.R. at 762 (noting

that when a debtor has served as the trustee of an express trust prior to bankruptcy, the trustee

must "fork over" the assets to the beneficiary as the debtor generally has no rights to the assets

kept in trust); Sommers v. Katy Steel Co., Inc. (In re Contractor Tech., Ltd.), 345 B.R. 800, 804

(Bankr. S.D. Tex. 2006) (discussing recovery of postpetition transfers under 11 U.S.C. § 549 and

stating "[t]o the extent that the Trustee holds only legal title, he is only recovering legal title; to

the extent that the Trustee holds legal and equitable title, he is recovering both"); Heilbronner v.

Nicosia (In re Valerino Constr., Inc.), 250 B.R. 39, 43 n.5 (Bankr. W.D.N.Y. 2000) (citing

Albert Pick Co., Inc. v. Travis , 6 F. Supp. 486 (E.D.N.Y. 1933)) ("Trust funds recovered by a

trustee or otherwise coming into the trustee's possession can only be distributed to the trust fund

beneficiaries . . . .").  It also appears from the summary judgment record that CLM treated

Servicing Account and Servicing Account I effectively as one account.  If that can be established

at trial, the parties should treat them as one account when performing their tracing analysis.  See

Connecticut Gen. Life Ins., 838 F.2d at 619 ("The fact that multiple accounts are consolidated

---

While the Court might agree, it is the Trustee's job to decide what claims to bring.

     The Court explains further that, in this case, by bringing such suit, the Trustee is fulfilling CLM's duties, which it breached, by ensuring that trust property used in violation of the trust, i.e., by funding other lenders' loans or paying interest on other loans, is recovered for the benefit of the true trust beneficiaries.  See Arctic Express Inc., 636 F.3d at 796 (stating that a trustee or beneficiaries of a trust may maintain an action for restitution of property or a disgorgement of the proceeds when a trustee in breach of his fiduciary duty to the beneficiaries of the trust transfers trust property to a third person); Sommers v. Katy Steel Co., Inc. (In re Contractor Tech., Ltd.), 345 B.R. 800, 804 (Bankr. S.D. Tex. 2006) (stating that a trustee's rights to recover wrongful or excessive distributions of trust property made to beneficiaries are well-defined by general principles of trust law).

     The Court takes no position at this time as to whether the Trustee is entitled to claim a commission against any property that is recovered for and ultimately distributed to trust beneficiaries as opposed to general unsecured creditors of CLM.

for accounting purposes on a single line of the financial statement does not, of course, mean that they are effectively one account.").  If not, then tracing would proceed on an account by account basis.  Id.

## III.  CONCLUSION

For the reasons explained above, the Court will grant the Motion to the extent that the Trustee has asserted claims on behalf of the estate of FRM as the summary judgment record reflects that none of the transfers at issue involved funds ever titled to FRM.  The Court will otherwise deny the Motion as there are genuine issues of material fact as to whether the Migliaccios can trace all of their funds.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   February 29, 2012                    /s/ J. Michael Deasy
                                             J. Michael Deasy
                                             Bankruptcy Judge